WILKINSON, Circuit Judge,
dissenting:
The majority in this case tries to present its view as some sort of innocuous jurisdictional disposition. But the jurisdictional ruling is wrong, and the decision is anything but innocuous. It inflicts significant damage on the separation of powers, allowing civil tort suits to invade theatres of armed conflict heretofore the province of those branches of government constitutionally charged with safeguarding the nation’s most vital interests.
I fully join Judge Niemeyer’s fine dissent. My good colleague has ably addressed many of the failings of today’s decision, and I see no need to repeat those points here. I write separately only because the difficulties with these actions are so legion that no single dissent could hope to cover them all.
The majority and I disagree on much, but there is no disagreement about the Abu Ghraib photographs that have apparently inspired this litigation. See ante at 209. Americans of good will were sickened by those photographs and the depraved conduct that would be reprehensible whenever, wherever, and against whomever it was applied. But acknowledging that fact answers only the question of whether this is a hard case. It does not answer the question whether it is bad law whose lasting consequences and abiding damage will long outlive the distressing photographs that have prompted the suits herein.
The actions here are styled as traditional ones and wrapped in the venerable clothing of the common law. Even on common law terms, however, they are demonstrably incorrect, and the impact which tort doctrine will have on military operations and international relations magnifies the difficulties immeasurably. I dare say none of us have seen any litigation quite like this and we default if we accept uncritically or entertain indefinitely this novel a violation of the most basic and customary precepts of both common and constitutional law.
Sadly, the majority’s opinion does precisely this. After reading its decision, one could be forgiven for thinking that the issue before us is a simple jurisdictional question arising out of ordinary tort suits. But these are not routine appeals that can be quickly dismissed through some rote application of the collateral order doctrine. This case instead requires us to decide whether the contractors who assist our military on the battlefield will be held accountable through tort or contract, and that seemingly sleepy question of common law remedies goes to the heart of our constitutional separation of powers. Tort suits place the oversight of military operations in an unelected judiciary, contract law in a politically accountable executive. And in the absence of some contrary expression on the part of the Article I legislative branch, the basic principles of Arti *226 ele II require that contractual, not tort, remedies apply.
The majority emphatically decides this weighty question by pretending not to decide, as its dismissal of these appeals gives individual district courts the green light to subject military operations to the most serious drawbacks of tort litigation. But arrogating power to the Third Branch in a contest over military authority is the wrong call under our Constitution, and there is no garb for this decision so benign as to obscure the import of what the majority has done.
We tread this territory at our peril. This decision is contrary to decades of Supreme Court admonitions warning federal courts off interference with international relations. Of course military contractors should be held accountable, and it is important that a framework be set in place to accomplish this task. But instead of establishing that framework, the majority succumbs to mere drift and in so doing places courts in the most damaging and least defensible legal landscape possible. None of us have any idea where exactly all this is headed or whether the damage inflicted on military operations will be only marginal or truly severe. At a minimum, however, today’s decision breaches a line that was respected by our predecessors on courts high and low. I would not cross this boundary even if the collateral order doctrine could cloak my steps. With all respect for my fíne colleagues, I would remand these actions to the district court with direction that they be dismissed.
Part I of my dissenting opinion discusses the utter unsuitability of tort actions such as these in the context of an international theatre of war. Part II addresses why contract law is compatible with the separation of powers and the responsibilities allocated the executive branch under Article II of our Constitution. Part III explains why the majority’s application of the collateral order doctrine goes beyond being incorrect to inflicting damage on American interests overseas.
I.
Tort regimes involve well-known tradeoffs. They may promote the public interest by compensating innocent victims, deterring wrongful conduct, and encouraging safety and accountability. However, tort law may also lead to excessive risk-averseness on the part of potential defendants. And caution that may be well-advised in a civilian context may not translate neatly to a military setting, where the calculus is different, and stakes run high. Risks considered unacceptable in civilian life are sometimes necessary on a battlefield. In order to secure high-value intelligence or maintain security, the military and its agents must often act quickly and on the basis of imperfect knowledge. Requiring consideration of the costs and consequences of protracted tort litigation introduces a wholly novel element into military decisionmaking, one that has never before in our country’s history been deployed so pervasively in a theatre of armed combat.
The majority acquiesces in judicial control over these sensitive military judgments. It opens the door for the plaintiffs to conduct broad discovery based on boilerplate complaints alleging a laundry list of state law claims, including “assault and battery,” “sexual assault and battery,” “intentional infliction of emotional distress,” and “negligent hiring and supervision.” By allowing such claims to go forward against contractors integrated into wartime combatant activities under control of the U.S. military, the majority raises thorny questions of whose law should apply, compromises the military’s ability to utilize contractors in the future, and nudges foreign policy and war powers away from the *227 political branches of the federal government and into the hands of federal courts. Simply put, these state tort claims have no passport that allows their travel in foreign battlefields, and we have no authority to issue one.
The complaint makes clear, and the contractors do not dispute, that the contractors here were acting in collaboration with U.S. military personnel. See, e.g., Al Shimari Amended Complaint ¶¶ 1, 70, 71, 118, 124, 135. The majority nonetheless draws the odd distinction that contractors and the military may be in a “conspiracy” without somehow being “integrated.” See ante at 222 n. 17. In addition to the forementioned paragraphs, the complaint in fact provides ample allegations of integration. For example, the Al-Quraishi plaintiffs claim that “L-3 employed all the civilian translators used by the military in Iraq,” Al-Quraishi Amended Complaint ¶ 78, and that “Defendants’ acts took place during a period of armed conflict, in connection with hostilities” in which the U.S. military was engaged, id. ¶280. Indeed, they allege integration so complete that civilian interrogators were giving orders to military personnel. Id. ¶ 221. For its contrary view, the majority departs from the well-established rule that we take the assertions of the complaint on a motion to dismiss as true. While the whole gravamen of the complaint is military-contractor cooperation and collaboration, the majority would have us believe they were more akin to strangers in the night.
The majority also suggests that the contractors may have departed from military instructions. See ante at 222 n. 17. If the contractors did depart from the military’s instructions, that would allow the government to pursue a breach of contract claim. See infra Part II. Ironically, the complaint itself speaks specifically in terms of a failure to “abide[ ] by the contract terms,” Al-Quraishi Amended Complaint ¶ 247, even though the plaintiffs were in no sense a party to the same. But any breach of contract does not begin to confer a cause of action in tort on the part of detainees in a theatre of armed conflict. There is no indication that Congress or any other law-making authority, federal or state, wanted foreign nationals in detention to litigate in tort the relationship between military contractors and the U.S. military when the government itself as a party to the contract has posited no need to do so.
A.
From this point, the problems with this litigation only multiply. First, due largely to their inventive nature, these suits present the difficult question of whose law should govern them. The majority clears the way for one federal court, sitting in Maryland, to apply Iraqi tort law to the alleged conduct — in an Iraqi war zone — of a Virginia-headquartered contractor integrated into wartime combatant activities of the U.S. military, and for another federal court, sitting in Virginia, to apply Virginia tort law to a similarly situated contractor for alleged conduct also occurring in an Iraqi war zone. This is, to put it mildly, no way to run a railroad.
1.
The court below in Al-Quraishi v. Nakhla, 728 F.Supp.2d 702 (D.Md.2010)— applying the principle of lex loci delicti— decided that “Iraqi law applies to all of Plaintiffs’ state law claims.” Id. at 763.* *228 This conclusion is highly troublesome. Most fundamentally, the application of Iraqi law against agents of the U.S. military constitutes a complete surrender of sovereignty. The majority allows Iraqi citizens who were imprisoned in an active theatre of war to bring tort suits against the occupying authority based on Iraqi causes of action. Such suits are not only novel, to say the least, but also in conflict with Supreme Court precedent. See, e.g., Dow v. Johnson, 100 U.S. 158, 165, 170, 25 L.Ed. 632 (1879) (explaining that occupying forces are not subject to the laws of the occupied territory); Coleman v. Tennessee, 97 U.S. 509, 515, 517, 24 L.Ed. 1118 (1878) (same).
The majority does not point to a single case in which foreign citizens were allowed to sue the occupying authority in its own courts under foreign causes of action. Likewise, it offers no support for its assertion that Dow and Coleman do not apply to military contractors, citing only Ford v. Surget, 97 U.S. 594, 24 L.Ed. 1018 (1878), a case implying that law-of-war immunity is not limited to uniformed soldiers. See Ford, 97 U.S. at 606-08 (holding a civilian immune from civil suit for burning cotton in support of the Confederate military).
Moreover, the majority is simply wrong in suggesting that the Dow and Coleman Courts were concerned only with protecting the occupying authority from foreign tribunals, in contrast to foreign laws. See, e.g., Dow, 100 U.S. at 165 (“When, therefore, our armies marched into ... the enemy’s country, their officers and soldiers were not subject to its laws, nor amenable to its tribunals for their acts. They were subject only to their own government, and only by its laws, administered by its authority, could they be called to account.” (emphases added)); id. at 170 (“The question here is, What is the law which governs an army invading an enemy’s country? It is not the civil law of the invaded country....” (emphasis added)); Coleman, 97 U.S. at 515 (“Officers and soldiers of the armies of the Union were not subject during the war to the laws of the enemy, or amenable to his tribunals for offences committed by them. They were answerable only to their own government, and only by its laws, as enforced by its armies, could they be punished.” (emphases added)); id. at 517 (Following military occupation, “the municipal laws of [the occupied territory] ... remain in full force so far as the inhabitants of the country are concerned .... This doctrine does not affect, in any respect, the exclusive character of the jurisdiction of the military tribunals over the officers and soldiers of the army of the United States ...; for, as already said, they were not subject to the laws nor amenable to the tribunals of the hostile country.” (emphases added)).
The application of Iraqi tort law to U.S. military contractors creates practical problems as well. American courts are ill-suited to decide unsettled questions of Iraqi law. The district court in Al-Quraiski, for instance, considered ‘Whether Aiding and Abetting and Conspiracy are Recognized Torts Under Iraqi Law and Whether Iraqi Law Allows Punitive Damages.” 728 F.Supp.2d at 764. The defendants argued *229 that aiding and abetting and conspiracy are not cognizable causes of action under Iraqi tort law, and that punitive damages are not allowed as a remedy. Id. The plaintiffs disagreed, and the parties “submitted affidavits from Iraqi law experts in support of their respective positions.” Id. Not surprisingly, considering the difficulty of ascertaining foreign law, the district court decided to “defer decision with respect to the content of Iraqi law.” Id.
Given that the district court had trouble deciding such rudimentary questions as whether aiding and abetting and conspiracy are even causes of action under Iraqi law, and whether Iraqi law allows punitive damages, how can we expect the court to decide the far more challenging issues necessary to a full-scale trial? For instance, how will it decipher the standard of care for each cause of action, and determine whether there was a breach? It can rely on expert testimony, of course, but Iraqi law experts appear to disagree as to whether these causes of action are even cognizable. See id. Accordingly, the majority allows a federal court to go forward with litigation in which Iraqi citizens sue a U.S. contractor working hand-in-hand with the U.S. military in a war zone under Iraqi causes of action that may not even exist.
Under the majority’s decision, military contractors face the prospect of drawn out lawsuits under the substantive tort law of every country in which they operate. Such a regime is unworkable in an era where the military has no choice but to contract with private corporations. In the present cases, for example, “a severe shortage” of military intelligence personnel “prompt[ed] the U.S. government to contract with private corporations to provide civilian interrogators and interpreters.” J.A. 408. This use of private contractors was deemed essential to the achievement of U.S. military objectives. Yet, under the reasoning of the Al-Quraishi district court, which the majority allows to stand, the contractors should have paused to consider their potential liability under the substantive tort law of Iraq before agreeing to supply the military needed personnel under the government contract.
Of course, corporations generally must weigh their potential liabilities before agreeing to specific projects. The possibility of defending a lawsuit every time a foreign citizen claims a violation of foreign tort law might substantially alter the profitability of government contracts. Thus, before agreeing to perform the most critical intelligence functions in support of the U.S. military, contractors would be forced to investigate and analyze the substantive tort law of every country in which its employees might work. This unenviable task would be even more burdensome when the substantive tort law varies from jurisdiction to jurisdiction within a country, as it does in the United States.
In other words, a court that understandably had difficulty deciding such elementary questions as “Whether Aiding and Abetting and Conspiracy are Recognized Torts Under Iraqi Law and Whether Iraqi Law Allows Punitive Damages,” Al-Quraishi, 728 F.Supp.2d at 764, is implying that contractors, before playing a critical role in the U.S. military effort in Iraq, should have analyzed the nuances and permutations of every Iraqi tort law that might conceivably affect them. By forcing contractors to undertake a highly complex and deeply uncertain legal analysis before aiding our military operations, particularly those executed quickly and in countries whose legal systems are unstable and unfamiliar, the majority jeopardizes the military’s ability to employ contractors in the future.
Like the courts, military contractors must rely on legal experts to analyze for *230 eign law. One suspects that most Iraqi legal experts practice law in Iraq, and indeed, the AEQuraishi plaintiffs relied on the declaration of an Iraqi attorney employed at an Iraqi law firm. Should the defendants have sought counsel from these Iraqi attorneys before helping the U.S. military with detention and interrogation functions? Should other contractors, before agreeing to aid in the U.S. military invasion of Iraq, have reached out to Iraqi lawyers for advice on the legal ramifications of such an attack under Iraqi tort law? Until now, these questions seemed far-fetched, but they are newly valid considerations under a regime that subjects lawsuit-averse American corporations to the substantive tort law of Iraq. My point is not at all to disrespect Iraqi law or lawyers, but to query the feasibility of extensive and uncertain legal inquiries into any foreign law on the eve or in the execution of military operations.
2.
Unlike the district court in Al-Quraishi v. Nakhla, 728 F.Supp.2d 702 (D.Md.2010), the district court in Al Shimari v. CACI Premier Technology, Inc., 657 F.Supp.2d 700 (E.D.Va.2009) deferred any ruling on the choice of law issues. See id. at 725 n. 7. As Judge King noted in his dissent from the now-vacated panel opinion, the Al Shimari plaintiffs argue that CACI is “liable to them under Virginia law for the torts of assault and battery, sexual assault, intentional and negligent infliction of emotional distress, and negligent hiring and supervision.” Al Shimari v. CACI Int'l, Inc., 658 F.3d 413, 427 (4th Cir.2011) (King, J., dissenting) (emphasis added). The plaintiffs, after all, are pressing Virginia causes of action, and thus if the suit is allowed to go forward, the question of whether Virginia tort law applies extraterritorially must be seriously asked. The answer to this question is clear: the application of Virginia tort law to overseas battlefield conduct by contractors acting under U.S. military authority is as problematic as the application of Iraqi law.
First, there is no indication whatsoever that the Commonwealth of Virginia has any interest in having its tort law applied abroad in these types of cases. Absent a contrary legislative intent, we assume that legislatures do not want their tort law to apply extraterritorially. For instance, in EEOC v. Arabian American Oil Co. (“Aramco”), 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), the Supreme Court held that Title VII of the Civil Rights Act of 1964 does not apply extraterritorially to regulate the employment practices of U.S. employers who employ U.S. citizens abroad. Id. at 246-47, 111 S.Ct. 1227. In reaching this conclusion, the Court relied on the “longstanding principle” that “ legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.’ ” Id. at 248, 111 S.Ct. 1227 (citation omitted). Given that “Congress legislates against the backdrop of the presumption against extraterritoriality,” the Court stated, “unless there is ‘the affirmative intention of the Congress clearly expressed,’ we must presume it ‘is primarily concerned with domestic conditions.’ ” Id. (citations omitted). Ultimately, the Court concluded that the petitioners had failed to provide sufficient evidence that Congress intended Title VII to apply abroad. Id. at 259, 111 S.Ct. 1227.
Citing Aramco, the Supreme Court recently reiterated these principles in Morrison v. National Australia Bank Ltd., — U.S. —, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), where it held that § 10(b) of the Securities Exchange Act of 1934 does not apply extraterritorially. Id. at 2877-78, 2883. The Court reasoned that “[t]he re- *231 suits of judicial-speculation-made-law — divining what Congress would have wanted if it had thought of the situation before the court — demonstrate the wisdom of the presumption against extraterritoriality.” Id. at 2881. “Rather than guess anew in each case,” the Court continued, “we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects.” Id.
Similarly, in Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), the Court concluded that judges must apply a “plain statement rule” before upsetting the standard constitutional balance of federal and state powers. Id. at 460-61, 111 S.Ct. 2395. “[I]f Congress intends to alter the usual constitutional balance,” the Court explained, “it must make its intention to do so unmistakably clear in the language of the statute.” Id. at 460, 111 S.Ct. 2395 (internal quotation marks omitted). “In traditionally sensitive areas,” the Court continued, “the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.” Id. at 461, 111 S.Ct. 2395 (internal quotation marks omitted).
Aramco, Morrison, and Gregory all involved the “longstanding principle” that “ ‘legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.’ ” Aramco, 499 U.S. at 248, 111 S.Ct. 1227 (emphasis added) (citation omitted). However, given that the Constitution entrusts foreign affairs to the federal political branches, see U.S. Const, art. I, § 8, els. 1, 11-15; art. II, § 2, els. 1-2, limits state power over foreign affairs, see id. art. I, § 10, and establishes the supremacy of federal enactments over state law, see id. art. VI, cl. 2, the presumption against extraterritorial application is even stronger in the context of state tort law.
It defies belief that, notwithstanding the constitutional entrustment of foreign affairs to the national government, Virginia silently and impliedly wished to extend the application of its tort law to events overseas. Or further, that it would do so in active disregard of Supreme Court pronouncements. For the Court has repeatedly stated that the federal government has exclusive power over foreign affairs, and that states have very little authority in this area. In Chae Chan Ping v. United States, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889), for instance, the Court noted, “ ‘[T]he United States is not only a government, but it is a national government, and the only government in this country that has the character of nationality. It is invested with power over all the foreign relations of the country, war, peace and negotiations and intercourse with other nations; all of which are forbidden to the state governments.’ ” Id. at 605, 9 S.Ct. 623 (citation omitted). The Court reiterated these principles in United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), emphasizing that “[governmental power over external affairs is not distributed, but is vested exclusively in the national government.” Id. at 330, 57 S.Ct. 758. The Belmont Court further noted that “complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states.” Id. at 331, 57 S.Ct. 758. Likewise, in Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), the Court stressed that “[o]ur system of government is such that ... the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left en *232 tirely free from local interference.” Id. at 63, 61 S.Ct. 399.
Such interference is precisely what we invite by ascribing to the fifty states the unexpressed wish that their tort law govern the conduct of military operations abroad. The principle against such interference holds even where the executive branch insists that the state law does not interfere with the foreign relations power. For instance, in Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), the Supreme Court struck down an Oregon probate law as “an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress.” Id. at 432, 88 S.Ct. 664. Although “[t]he several States ... have traditionally regulated the descent and distribution of estates,” the Court concluded, “those regulations must give way if they impair the effective exercise of the Nation’s foreign policy.” Id. at 440, 88 S.Ct. 664. In its brief amicus curiae, the Department of Justice stated, “The government does not ... contend that the application of the Oregon escheat statute in the circumstances of this case unduly interferes with the United States’ conduct of foreign relations.” Id. at 434, 88 S.Ct. 664. The Court disregarded this statement, reasoning that the state action might cause “disruption or embarrassment” that the Justice Department failed to appreciate. Id. at 434-35, 441, 88 S.Ct. 664. In concurrence, Justice Stewart was even less deferential toward statements from the executive branch:
We deal here with the basic allocation of power between the States and the Nation. Resolution of so fundamental a constitutional issue cannot vary from day to day with the shifting winds at the State Department. Today, we are told, Oregon’s statute does not conflict with the national interest. Tomorrow it may.
Id. at 443, 88 S.Ct. 664 (Stewart, J., concurring).
3.
So too here, we are hardly required to defer to the Justice Department’s statements that these cases should go forward. The Department urges us to
hold that state tort law claims against contractors are generally preempted if similar claims brought against the United States would come within the FTCA’s combatant activities exception and if the alleged actions of the contractor and its personnel occurred within the scope of their contractual relationship with the government, particularly if the conduct occurred while contractor personnel were integrated with the military in its combat-related activities.
Br. of United States at 2-3.
So far, so good. And one would think that this would be the end of it. However, the Department carves out an exception where “a contractor has committed torture as defined in 18 U.S.C. § 2340,” the federal anti-torture statute. Id. at 3. The government then elaborates further on its proposed exception by implying that state-law tort remedies need not be available going forward “in light of measures subsequently instituted by Congress and the Executive Branch, and other developments in the aftermath of Abu Ghraib.” Id. at 23. Like the Justice Department’s brief in Zschemig, this vaguely explained and inexplicably derived exception is not entitled to deference by this court. As the Supreme Court only recently reiterated, “[T]he separation of powers does not depend on ... whether ‘the encroached-upon branch approves the encroachment.’ ” Free Enteiyrise Fund v. Pub. Co. Accounting Oversight Bd., — U.S. —, 130 S.Ct. 3138, 3155, 177 L.Ed.2d 706 (2010) (quoting New York v. United States, 505 *233 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)).
The government does not point to a single expression of congressional intent in support of permitting state law tort claims to apply overseas based solely on the nature of the allegations. Instead, it asserts that “in the limited circumstances where the state law claim is based on allegations that the contractor committed torture, as defined in 18 U.S.C. § 2340, courts should take into account the strong federal interests embodied in that federal law.” Br. of United States at 22. In these circumstances, the government suggests, “the totality of the federal interests is different and does not require that state-law tort suits against contractors be preempted.” Id. at 3.
It is difficult to see how 18 U.S.C. § 2340 — which exhibits an interest in punishing torture through federal criminal prosecution — demonstrates any congressional interest in permitting torture-based state tort claims. The federal anti-torture statute, 18 U.S.C. § 2340 et seq., does not even contain a private right of action. And in any event, courts have no license to create exceptions based on helter-skelter application of federal criminal statutes, exceptions that permit otherwise preempted state tort claims to go forward.
It is elemental that a federal court cannot simply engraft on its own a federal criminal law standard onto state tort claims. The federal judiciary is not permitted to reconfigure the elements of a state law cause of action. For as the “[Supreme] Court recognized in [Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988),] the responsibility for defining the elements and scope of a state cause of action rests with the state legislature and state courts.” Childers v. Chesapeake & Potomac Tel. Co., 881 F.2d 1259, 1265 (4th Cir.1989).
This court requested the government’s submission of an amicus brief here, and I am appreciative of that submission. However, the government’s amicus position is at odds with its own conduct. If the government believes that there have been contractual or criminal violations on the part of its own contractors, then it should proceed to exercise its unquestioned contractual and prosecutorial authority to go after the culpable party. See infra Part II.B. If it does not believe such violations have occurred, it should say so. But given the significance of this case, the exclusive competence of the federal government in the field of foreign affairs, and the principles articulated in Aramco, Morrison, and Gregory, neither the federal executive nor the federal judiciary is entitled to assume that states want their tort law applied extraterritorially absent a plain statement to the contrary.
Here there is no indication that the Commonwealth of Virginia intended to apply its laws of assault, battery, sexual assault, intentional and negligent infliction of emotional distress, and negligent hiring and supervision to the battlefield conduct of contractors integrated into the wartime activities abroad of the U.S. military. A state’s interest in employing a tort regime is largely confined to tortious activity within its own borders or against its own citizens. It is anything but clear that Virginia has any interest whatsoever in providing causes of action that allow foreign citizens that have never set foot in the Commonwealth to drag its own corporations into costly, protracted lawsuits under who-knows-what legal authority.
Notwithstanding the presumption against extraterritorial application of state law and the absence of any indication that the Commonwealth wants its tort law ap *234 plied to battlefield conduct, the Al Shimari plaintiffs ask the district court to apply Virginia tort law to war-zone conduct that took place over 6,000 miles away. It is difficult to find a limiting principle in the plaintiffs’ analysis. Under their approach, Virginia tort law — and the tort regimes of all fifty states — can be applied to conduct occurring in every corner of the earth. By allowing plaintiffs’ causes of action to go forward, the majority lends its imprimatur to the extraterritorial application of state tort law. Reading the majority’s opinion, I wonder if my friends will next launch state tort law into outer space.
4.
Even if the Commonwealth had somehow intended the extraterritorial application of its tort law, which it has not, the Supreme Court has made clear that state laws aimed at influencing foreign relations cannot stand when they conflict with federal objectives. In Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), for example, the Court invalidated a Massachusetts law that restricted state agencies from purchasing goods or services from companies doing business with Burma. Id. at 366, 120 S.Ct. 2288. The Court reasoned that the state law was “an obstacle to the accomplishment of Congress’s full objectives” under a federal law that directed the President to develop a comprehensive, multilateral strategy toward Burma. Id. at 369, 373, 120 S.Ct. 2288. By “imposing a different, state system of economic pressure against the Burmese political regime,” the Court explained, “the state statute penalizes some private action that the federal Act (as administered by the President) may allow, and pulls levers of influence that the federal Act does not reach.” Id. at 376, 120 S.Ct. 2288. Consequently, the Court explained, the Massachusetts law could not stand because it “compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments.” Id. at 381, 120 S.Ct. 2288.
Similarly, in American Insurance Ass’n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003), the Court struck down California’s Holocaust Victim Insurance Relief Act, which required any insurer doing business in the state to disclose information about Holocaust-era insurance policies. Id. at 401, 123 S.Ct. 2374. The Court began by noting,
There is ... no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government’s policy, given the ‘concern for uniformity in this country’s dealings with foreign nations’ that animated the Constitution’s allocation of the foreign relations power to the National Government in the first place.
Id. at 413, 123 S.Ct. 2374 (citation omitted). In the context of Holocaust-era insurance claims, explained the Court, “California seeks to use an iron fist where the President has consistently chosen kid gloves.” Id. at 427, 123 S.Ct. 2374. Accordingly, the Court held that the state statute was preempted because it “interferes with the National Government’s conduct of foreign relations.” Id. at 401, 123 S.Ct. 2374.
Under Crosby and Garamendi states are prohibited from obstructing the foreign policy objectives of the federal government. There can be no question that there is obstruction here, where the federal law, speaking with one voice, can potentially be supplanted by the fifty different voices of varying state tort regimes, each one potentially working at cross-purposes with federal aims. Thus, even if Virginia wanted to extend its tort law to overseas battlefield conduct of military contractors, *235 it cannot create an “obstacle to the accomplishment of Congress’s full objectives” under federal law. Crosby, 530 U.S. at 373, 120 S.Ct. 2288. Because Congress has emphatically forbid tort law from governing battlefield conduct, any attempt to “imposte] a different, state system” on the battlefield, id. at 376, 120 S.Ct. 2288, would impermissibly “interfere[] with the National Government’s conduct of foreign relations,” Garamendi 539 U.S. at 401, 123 S.Ct. 2374.
B.
In contrast to the Commonwealth of Virginia, Congress has a constitutionally protected role in foreign affairs. See U.S. Const, art. I, § 8, els. 1, 11-15. Congress undoubtedly has the power to allow private parties to pursue tort remedies against war-zone contractors operating under military authority. “[T]he Constitution contemplated that the Legislative Branch have plenary control over ... regulations, procedures and remedies related to military discipline.... ” Chappell v. Wallace, 462 U.S. 296, 301, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). Congress could thus do what the majority has asserted its own right to do, namely to authorize foreign nationals as private attorneys general to police contractor conduct in theatres of armed combat. However, contrary to the plaintiffs’ assertions, there is no indication that Congress has pursued any such course.
Plaintiffs contend that the Federal Tort Claims Act (“FTCA”) permits private parties to bring state law tort suits against military contractors for wartime conduct. In analyzing this claim, we must adhere to the longstanding presumption that Congress does not permit private parties to interfere with military operations absent explicit statutory authorization. “[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs,” Dep’t of Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), and this hesitance to transgress constitutional boundaries applies fully to our interpretation of statutes. See Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (declining to read the FTCA’s broad waiver of sovereign immunity to allow military personnel to sue the government for service-related injuries even though no provision explicitly prevents them from doing so); see also United States v. Johnson, 481 U.S. 681, 690, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987) (reaffirming the holding in Feres because “suits brought by service members against the Government for injuries incurred incident to service ... are the ‘type[s] of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.’ ” (emphasis in original) (citation omitted)).
To adopt plaintiffs’ reading of the FTCA would require us to abandon this tradition of restraint. This broadly phrased statute does not contain anything close to a congressional authorization to private parties to hale war-zone military contractors into civilian courts. At most, it provides that “the term ‘Federal agency’ ... does not include any contractor with the United States.” 28 U.S.C. § 2671. But that broad definitional provision does not mean that “contractors ... are expressly excluded from the FTCA’s reach” in the area of battlefield torts. Al Shimari, 658 F.3d at 435 (King, J., dissenting). For a “general statutory rule usually does not govern unless there is no more specific rule,” Green v. Bock Laundry Mach. Co., 490 U.S. 504, 524, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989), but here there is another provision *236 of the FTCA that speaks more specifically to whether military contractors are immune from these tort actions.
That provision is the combatant activities exception, which preserves the government’s sovereign immunity against “[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.” 28 U.S.C. § 2680(j). Multiple textual clues in this exception indicate that Congress wanted to keep tort law out of the battlefield regardless of a defendant’s status as a soldier or a contractor.
To start with, the exception bars claims “arising out of’ combatant activities, id., and this phrase is among the broadest in the law. “[I]n workmen’s compensation statutes,” for instance, “[t]he arising-out-of test is a familiar one used ... to denote any causal connection between the term of employment and the injury.” Saleh v. Titan Corp., 580 F.3d 1, 6 (D.C.Cir.2009) (emphasis in original) (footnote omitted). Indeed, the use of this phrase in other FTCA exceptions has precluded a wide range of actions. For instance, the “sweeping language” of 28 U.S.C. § 2680(h) — which preserves the government’s sovereign immunity against claims “arising out of assault [or] battery” — bars not only battery actions, but negligence claims that “stem from a battery” as well. United States v. Shearer, 473 U.S. 52, 55, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) (plurality opinion); see also Kosak v. United States, 465 U.S. 848, 854, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984) (equating “arising in respect of’ in 28 U.S.C. § 2680(c) with “arising out of’ and observing that the former “encompassing phrase ... seems to sweep within the exception all injuries associated in any way with the ‘detention’ of goods”). Congress wanted to forbid tort suits stemming from combatant activities, and it chose in “[a]ny claim arising out of’ a broad and widely recognized prohibitory term.
The exception’s use of the term “combatant activities” does not denote a narrow subset of military operations but a legislative intention to prevent tort from entering the battlefield. This term encompasses “not only physical violence, but activities both necessary to and in direct connection with actual hostilities,” Johnson v. United States, 170 F.2d 767, 770 (9th Cir.1948), and therefore has a considerable sweep. As the Supreme Court has noted, this provision “paint[s] with a far broader brush” than other FTCA exceptions that bar suits arising out of a subset of harms associated with a particular area. See Dolan v. U.S. Postal Serv., 546 U.S. 481, 489-90, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006) (contrasting the combatant activities exception in § 2680(j) with § 2680(b), which preserves immunity for “just three types of harm” associated with mail delivery). Given the broad language of the combatant activities exception, it is difficult to believe that Congress wanted the sensibilities of tort to govern the realities of war.
Indeed, as the District of Columbia Circuit recognized, “the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield.” Saleh, 580 F.3d at 7. Congress insulated the theatre of war from tort law because it “recognize[d] that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action.” Koohi v. United States, 976 F.2d 1328, 1337 (9th Cir.1992). In order to shield “[a]ny claim arising out of the combatant activities of the military” from tort liability, Congress used some of the broadest language possible when drafting this exception. It is not our role to dismember this exclusion’s text in order to determine *237 when and to what extent torts can arise from combatant activities after all.
If this textual evidence were not enough, the Supreme Court has refused to read the FTCA to authorize tort suits against defense contractors, albeit in a slightly different context. See Boyle v. United Techs. Corp., 487 U.S. 500, 511-12, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The contractor in Boyle provided a helicopter for the military rather than aid in a war-zone, id. at 502, 108 S.Ct. 2510, but the logic is the same. Because the FTCA’s discretionary function exception precluded suits against the government for design defects in military equipment, Boyle held that it barred those actions against defense contractors as well. Id. at 511-12, 108 S.Ct. 2510. As the Court observed, “[i]t makes little sense to insulate the Government against financial liability ... when the Government produces the equipment itself, but not when it contracts for the production.” Id. at 512, 108 S.Ct. 2510.
I recognize that the temptation exists to exalt the brave men and women who defend our nation in time of war, and then, in the next breath, to disparage contractors as some sort of evil twin responsible for wars’ inevitable missteps and excesses. But the FTCA does not permit such a dichotomy. It makes even less sense than in Boyle to shield the military from litigation for the battlefield activities of soldiers but not contractors. In Boyle, the Supreme Court did not even require a military-specific exception before insulating military contractors from design-defect liability. Instead, the Court relied on the discretionary function exception, which is not specific to military operations but instead broadly precludes claims “based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government.” 28 U.S.C. § 2680(a); Boyle, 487 U.S. at 511-12, 108 S.Ct. 2510. Here, by contrast, Congress has provided an exception that singles out claims “arising out of ... combatant activities.” 28 U.S.C. § 2680(j). If the Supreme Court was willing to read the former general provision to cover military contractors, it would not hesitate to do the same with the latter more targeted exception.
In addition to enacting the combatant activities exception, Congress has indicated its desire to keep tort law off the battlefield by subjecting certain military contractors to other forms of discipline for war-zone conduct. For instance, the Uniform Code of Military Justice (“UCMJ”) applies not only to members of our military, but to “persons serving with or accompanying an armed force in the field” in “time of declared war or a contingency operation” as well. 10 U.S.C. § 802(a)(10). The Military Extraterritorial Jurisdiction Act likewise subjects these contractors to domestic criminal sanctions by punishing anyone who, “while employed by or accompanying the Armed Forces” abroad, “engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States.” 18 U.S.C. § 8261(a)(1). Unlike the application of state tort law, these procedures for holding contractors accountable were approved by Congress.
Ignoring the military risks and legal constraints that prohibit extraterritorial application of state tort law, the majority inserts tort into the battlefield by allowing these suits to go forward. But before applying state tort law to the combat activities of contractors working under the U.S. military, we should make certain that the legislative branch has authorized us to do *238 so. As the Supreme Court explained in United States v. Stanley, 488 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), “[T]he insistence ... with which the Constitution confers authority over the Army, Navy, and militia upon the political branches ... counsels hesitation in our creation of damages remedies in this field.” Id. at 682, 107 S.Ct. 3054. Because I find no evidence that Congress has recruited private parties — much less foreign nationals — to police the frontline, I cannot join my colleagues’ decision to the contrary.
C.
Instead of deferring to Congress’s valid exercise of its constitutionally granted powers, the majority places contractor accountability in the hands of the unaccountable. Thanks to the majority’s efforts, contractors that were previously subject to the control of the executive have new judicial masters. But when unelected judges render contestable decisions about military policy in the course of applying tort law to contractors, the public will be unable to remove them from them posts. This flies in the face of our constitutional tradition of ensuring some popular control over the prosecution of a war. As the Supreme Court has explained, “[Mjatters of war-making belong in the hands of those who are ... most politically accountable for making them.” Hamdi v. Rumsfeld, 542 U.S. 507, 531, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion).
No one will contend that tort law, however derived and defined, is a field excelling in precision. The vagueness and indeterminacy of these cut-and-paste causes of action will permit judicial discretion and jury variability to govern this most sensitive of areas. Courts must henceforth set the standards of care in matters of wartime captures, detentions, and interrogations as well as the measure of damages for the same. Not only that, but methods of interrogation and procurement of intelligence will be at the sufferance of a single judicial officer, safely ensconced in a secure courtroom, passing judgment on battlefield conduct thousands of miles away. Litigants will plead as a matter of course to the breach of whatever may seem the prevailing standard of care, thus setting in motion logistical problems inherent in transcontinental tort suits of such novel stripe.
The results of the rising tide of litigation will be both unpredictable and contradictory, as particular judges and juries debate and disagree over which methods of detention and interrogation are permissible. And as detention of the enemy becomes a more litigious enterprise, the incentives to shortcut capture with more lethal and unmanned measures may rise. Whether or not one approves of transplanting the delicacy and etiquette of the judicial branch into a theatre of war is not the question. These lawsuits presage a massive transfer of authority reserved to the political branches under Articles I and II of our Constitution into judicial hands, and to a single trial judge and jury to boot. This is a subject one would expect Congress to address in great and meticulous detail, as it has, for example, in the Military Commissions Act of 2009, Pub.L. 111-84, 123 Stat. 2190, 2574-614, the Military Commissions Act of 2006, Pub.L. 109-366, 120 Stat. 2600, and the Detainee Treatment Act of 2005, Pub.L. 109-148, 119 Stat. 2739, and I respectfully take issue with the matter-of-fact manner in which the gravity of the step taken is not even acknowledged by the majority, much less addressed.
By opening the door to the extraterritorial application of different state tort regimes, the majority allows for unlimited variation in the standard of care that is applied to critical combatant activities. *239 There is not a widely agreed upon standard of care for overseas detentions and interrogations, and different states will allow different causes of action to go forward and will apply different standards to them. Amd even if there were an agreed upon standard — which there is not — particular judges and juries would apply that standard inconsistently. Such a standard would probably bottom out on some version of reasonableness. But in the context of detention and interrogation, what exactly does reasonableness mean? That question could provoke innumerable answers, and the very vagueness of tort formulations as to the standard of care means that civilian jurors will be setting the standards for detention and interrogation of military detainees without knowledge of conditions that obtain in a zone of combat halfway across the globe. I imply no disrespect of jurors who give of their time and good sense to our system of justice, but this system will provide no guidance and no predictability whatsoever because it will leave the conduct of military functions to the fortuities of litigious hindsight.
Contractors can be forgiven for not wanting to entrust their employees to the vagaries and caprice of individual verdicts and trials. Add to that the prospect of punitive damages and other uncertain measures of recovery, and one will introduce into the detention and interrogation process a degree of risk aversion that could well result in the gathering of as little vital intelligence as possible. While some may regard reduced interrogations with satisfaction, those whose lives and fortunes depend upon the acquisition of vital intelligence are not likely to join any chorus of approval.
The majority’s response is undoubtedly that all these questions remain to be “ironed out.” But such words are small comfort to those who must make critical decisions in the field while we sit here in Virginia or Maryland or whatever other venue is doing the “ironing.”
By dismissing these appeals, the majority only drifts and dawdles, sparing itself the need to come to grips with the issues, and kicking the can far down the road. The majority fails to recognize that this is a matter of some urgency. Just for starters, commanders in the field need actionable battlefield intelligence in order for soldiers to survive. Few wars have been or will be prosecuted successfully without intelligence that permits units to plan accurate strikes against enemy forces, and every bit as importantly, to know when lethal force is plotted against Americans themselves. Actionable intelligence has always had both offensive and defensive value. In other words, intelligence not only assists us in prevailing; it saves American lives.
While there is legitimate debate about how intelligence is best obtained, a tort suit is probably the very worst forum in which that issue can or should be resolved. The judges and juries who review those matters cannot fairly be expected to possess a background in the utility of different forms of military intelligence, and to ask them to decide such sensitive, delicate, and complicated questions is, in a word, unrealistic. See Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1286-87 (11th Cir.2009) (explaining that military intelligence-gathering is traditionally insulated from judicial review); United States v. Truong Dink Hung, 629 F.2d 908, 913-14 (4th Cir.1980) (noting that “the courts are unschooled in diplomacy and military affairs, a mastery of which would be essential to passing upon” matters of intelligence). None of this is to say, of course, that military contractors are without fault or that abuses should ever go unremedied. It is simply to make the point that some *240 thing as mischievous as the placement of tort law in military calculations should be approved by some body capable of appreciating the consequences of its action and constitutionally entrusted with the task.
II.
A.
While the present suits may focus upon methods of interrogation and conditions of detention, the issue is larger even than that. In assuming that tort suits are a preferred method of policing the contractors who assist military operations, the majority obscures the fact that there exists a more proper remedy in this area. In the absence of some contrary expression by the Congress, the most basic precepts of separation of powers require that the alleged abuses of military contractors must be addressed through the medium of contract, not through tort. In short, without a clear manifestation of Article I congressional intent, Article II mandates that contractual, not tort remedies, be utilized.
It is a truism that government, including the military, must contract. Few, if any, governmental tasks are undertaken today without some form of public-private partnership. The federal government routinely carries out sensitive public functions through private entities, from running background checks, see United States v. Virginia, 139 F.3d 984, 986 (4th Cir.1998), to rehabilitating prisoners, see Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 63 n. 1, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), to investigating criminal activity, see United States v. Warshak, 631 F.3d 266, 320 (6th Cir.2010). Assisting with combat operations is no different. There is “ample evidence that the military finds the use of civilian contractors in support roles to be an essential component of a successful war-time mission.” Lane v. Halliburton, 529 F.3d 548, 554 (5th Cir.2008). The Department of Defense “employs around 170,000 military contractors on a yearly basis, having more than doubled its use of contracting services since 2001.” Lauren Groth, Transforming Accountability: A Proposal for Reconsidering how Human Rights Obligations Are Applied to Private Military Security Firms, 35 Hastings Int’l & Comp. L.Rev. 29, 38 (2012).
Apart from being necessary, the military’s partnership with private enterprise has salutary aspects as well. For one thing, it permits our all-volunteer military to handle troop shortages in a cost-efficient manner. According to the Army Field Manual, “[rjecent reductions in military structure, coupled with high mission requirements and the unlikely prospect of full mobilization, mean that to reach a minimum of required levels of support, deployed military forces will often have to be significantly augmented with contractor support.” U.S. Dep’t of the Army, Field Manual 3-100.21, Contractors on the Battlefield Preface (2003). Because of these changes in our military, “the future battlefield will require ever increasing numbers of often critically important contractor employees.” Id.
These partnerships also allow the military and its contractors to pool their respective expertise and bring the best of public service and private industry to bear on the mission at hand. This reliance on contractor expertise will become only more necessary as warfare becomes more technologically demanding. As the Army Field Manual notes, “the increasingly hi-tech nature of our equipment ... [has] significantly increased the need to properly integrate contractor support into all military operations.” Id. War is not a static enterprise, and our military will need every bit of the edge that technological expertise affords in order to face the *241 hostilities of the future. Only the clueless believe future battlefields will not prominently feature private contractors.
B.
Given these realities, it is illusory to pretend that these suits are simply ordinary tort actions by one private party against another. Instead, because contractors regularly assist in “the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible ... to the electoral process,” see Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), a decent respect for the separation of powers compels us to consider what sort of remedy would best ensure the authority of the executive over those with whom it partners in carrying out what are core executive functions. The answer is obvious. Unlike tort, contract law gives the executive branch a mechanism of control over those who regularly assist the military in performing its mission.
For one thing, contract law is a more textually precise field than tort law, allowing the executive branch to set the standard of care in the terms of the contract. In contrast to tort suits in which judges would have to decide what constitutes a “reasonable bombing,” McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1350 (11th Cir.2007), a “prudent intercept,” Tiffany v. United States, 931 F.2d 271, 279 (4th Cir.1991), or a legitimate interrogation method, contract cases would turn on more definite language in the contract itself — language that reflected the policy choices of a democratically accountable branch. Rather than rely on the judicial application of some indeterminate standard of reasonable care, the executive branch could require contractors to abide by well-established military rules and manuals in the terms of its contractual agreement. For instance, the government could direct military contractors to “adhere to the standards of conduct established by the operational or unit commander.” See Ibrahim v. Titan Corp., 556 F.Supp.2d 1, 6 (D.D.C.2007) (internal quotation mark and citation omitted). Focusing on the government’s contract rather than theories of tort would also ensure that important federal interests were not “left to the vagaries of the laws of the several States,” but instead “governed by uniform rules” in the contracts themselves. Carlson v. Green, 446 U.S. 14, 23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). The majority, however, appears to prefer judicial supervision through malleable and multiple tort standards to executive control through clearer and more consistent contractual provisions.
Contract law also gives the executive branch, as party to the contract, the opportunity to pursue a variety of remedies. In addition to being able to sue a contractor in the event of a breach, the executive can create more tailored sanctions in the terms of the contract itself. The government, for example, could contractually reserve the right to demand that its contractor “remove ... any employee for reasons of misconduct,” see Ibrahim, 556 F.Supp.2d at 7 (omission in original), thereby allowing it to jettison bad apples without jeopardizing an entire military operation.
These contractual tools are not the only ones available to the executive branch. They are augmented by a web of regulations to which contractors subject themselves by partnering with the military. Army Regulations, for example, permit commanders to “apprehend and detain contractors for violations of the law” as well as “restrict or revoke ... access to Army facilities or installations for disciplinary infractions.” Army Reg. 715-9 § 4-2(e). What is more, the government *242 can pursue military sanctions against contractors for battlefield misconduct under the UCMJ, see 10 U.S.C. § 8Q2(a)(10), as well as domestic criminal punishments against contractors for crimes committed abroad, see 18 U.S.C. § 3261(a)(1). Just within this circuit, in United States v. Passaro, 577 F.3d 207 (4th Cir.2009), a “paramilitary contractor” was convicted of federal assault charges arising out of the lethal interrogation of a detainee in Afghanistan. See id. at 210-12. The government has employed its prosecutorial powers to punish rogue interrogators in the past, and I see little reason why it would forswear the use of such sanctions in the future. See Saleh, 580 F.3d at 2 (noting that in the wake of the events at Abu Ghraib, the executive branch obtained convictions of a number of soldiers involved and pursued “extensive investigations” into allegations of abuse by contractors).
When combined with contractual tools, these laws provide the executive branch with an arsenal of remedies ranging from removal of a specific contractor to criminal punishment. The executive requires “a degree of discretion” in the area of national security, see United States v. CurtissWright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936), and this selection of sanctions gives it an appropriate amount of flexibility. Because the military and its contractors are tightly bound, litigation in federal court often subjects both to judicial process. Unlike tort suits instigated at the behest of private parties, contractual and criminal enforcement permits the executive to protect military commanders and contractors from being “unnecessarily and dangerously distracted by litigation half a world away” and to prevent “discovery into military operations” from “intruding] on the sensitive secrets of national defense.” See Hamdi, 542 U.S. at 532, 124 S.Ct. 2633 (plurality opinion).
In sum, it is silly to think that without tort suits, military contractors will simply be wandering around war zones unsupervised. What the chain of command does for military officers, contract law does for military contractors. As the Army Field Manual notes, “The military chain of command exercises management control through the contract.” U.S. Dep’t of the Army, Field Manual, supra, § 1-25. “[Pjroper military oversight of contractors is imperative” to integrating these private actors into military operations, id. § 1-23, and contract law achieves this goal in ways that tort law cannot. Even though contractors are not formally “part of the operational chain of command,” they are “managed in accordance with the terms and conditions of their contract” through the Contracting Officer Representative, who “serves as the operational commander’s primary oversight.” Army Reg. 715-9 § 4—1(c)—(d). Thus, contract law ensures that these contractors are “subject to military direction, even if not subject to normal military discipline.” Saleh, 580 F.3d at 7. In other words, “the Government’s broad authority ... in managing its operations does not turn on” whether “contract employees” or “civil servants” are involved. NASA v. Nelson, — U.S. —, 131 S.Ct. 746, 758-59, 178 L.Ed.2d 667 (2011) (citation omitted).
Tort law, however, conflicts with rather than complements these contractual mechanisms of control by “interfering] with the federal government’s authority to punish and deter misconduct by its own contractors.” See Saleh, 580 F.3d at 8. The majority’s allocation of common law remedies is paradoxically not just a matter of common law. It is a decision concerning which branch of government will control the contractors that assist our soldiers on the battlefield. Whereas contract and criminal law places contractor accountabili *243 ty where Article II places it — in the hands of the executive — tort law places it in the hands of the judiciary. But the executive branch — and not the judicial — is responsible for overseeing a war effort under the Constitution. Whereas the President is required as Commander in Chief “to take responsible and continuing action to superintend the military,” Loving v. United States, 517 U.S. 748, 772, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), we as judges are “not given the task of running the Army.” Orloff v. Willoughby, 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953).
It is disquieting to say the least that the majority now believes it can displace, or to use a euphemism, “supplement” executive control of military contractors with judicial oversight. The costs of that decision will be severe. For one thing, it bleeds together two areas of law — tort and contract— that are conceptually distinct. No one disputes that those contractors who actually engage in torture breach those provisions of their contracts that require them to act in accordance with federal law. But a “[bjreach of contract is not a tort,” XCO Int’l Inc. v. Pac. Scientific Co., 369 F.3d 998, 1002 (7th Cir.2004), and it only muddies the law to permit private litigants to bring tort suits against contractors just because the latter allegedly violated an agreement with the executive. “[T]he main currents of tort law run in different directions from those of contract,” E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 873 n. 8, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), and it does little good to attempt to channel them together.
C.
At bottom, the majority’s facilitation of tort remedies chills the willingness of both military contractors and the government to contract. I have previously discussed the chilling effect today’s decision will have on private contractors, see supra Part I, but I fear that the majority’s efforts will discourage the government from partnering with private industry as well. Congress might well think the defense budget large enough without courts adding the prospect of uncertain tort liabilities. By increasing through prospective tort suits the costs of employing contractors on the battlefield, the majority interferes with the executive branch’s capacity to carry out its constitutional duties. To the Defense Department in an era of cost consciousness, the threat of tort liability can chill both the government’s ability and willingness to contract by raising the price of partnering with private industry, and that is particularly true here. Boyle noted, in fact, that burdens of “tort suits” against military contractors “would ultimately be passed through ... to the United States itself, since defense contractors will predictably raise their prices to cover ... contingent liability.” 487 U.S. at 511-12, 108 S.Ct. 2510. So long as the executive branch could control contractual performance through contract law, it had little reason to eschew valuable partnerships with private enterprise. But now that third parties can pull contractors and their military supervisors into protracted legal battles, we can expect a distortion of contractor and military decisionmaking to account for that contingency. As the Saleh court explained, “Allowance of such suits will surely hamper military flexibility and cost-effectiveness, as contractors may prove reluctant to expose their employees to litigation-prone combat situations.” 580 F.3d at 8. It will no longer be enough that military contractors meet their contractual commitments to a T, for there exists no assurance that the standard of care embraced in subsequent tort suits will incorporate by reference or otherwise the criterion of meeting one’s contractual obligations.
*244 “[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.” Loving, 517 U.S. at 757, 116 S.Ct. 1737. Today’s decision does precisely that. “[T]he Government’s practical capacity to make contracts” is “the essence of sovereignty itself.” United States v. Winstar, 518 U.S. 839, 884, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (internal quotation mark and citation omitted). By making the contract the essence of the government-contractor partnership, we diminish the capacity of our adversaries to erode this critical aspect of our national sovereignty through litigation. Conversely, by elevating tort as a mechanism of weakening this essential partnership, we give those who do not wish us well a means of putting their ill will to use. I can understand that our enemies would seek to use our own laws as a weapon against us, but I cannot understand why we should sanction suits, the unintended effect of which is to equip them.
III.
Rather than engage in a frank discussion of the consequences that will ensue from its ruling, the majority seeks a cubby hole in the collateral order doctrine. This argument misses the mark- — -for many of the same reasons that tort law does not belong on the battlefield, this case does not belong back before the district court. We are engaged in a lot of semantic word games here, losing completely the forest for the trees. The collateral order doctrine is not a matter of legalistic banter, but of letting an appellate court confront in a timely manner issues presenting grave, far-reaching consequences. Before us is a deeply unfortunate instance of litigation creep where doctrines that postpone appeals in a domestic context are transposed to an international setting without recognition of the gravity of such a shift of gears.
The collateral order doctrine is premised on the eminently reasonable conclusion that immunities from suit should be recognized sooner rather than later, because the “rigors of trial” can often be every bit as damaging as an adverse judgment. Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 870, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994). Indeed, the “crucial distinction between a right not to be tried and a right whose remedy requires ... dismissal” is whether the immunity in question would be eviscerated by the very process of litigation. United States v. Hollywood Motor Car Co., 458 U.S. 263, 269, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982).
Here, the asserted immunity can take on different labels — “law-of-war immunity,” “Boyle preemption,” or an inherently political question — but the underlying premise is the same: that suits for damages against private defendants arising out of military contracts performed in a theatre of war are not cognizable by the federal courts under state tort law. The point of this immunity is not to determine after all the vicissitudes of litigation who should win and who should lose. Rather, it is a recognition that sensitive military matters should be insulated at the outset from judicial scrutiny, and the cases to this effect are legion.
The majority’s contrary holding is animated by a single mistaken belief: that “the denial of a preemption claim stemming from the combatant activities exception would not ... entail significant scrutiny of sensitive military issues.” Ante at 218-19. The majority expresses this confidence despite its observation that “the questions that will require proper answers ... have yet to be fully ascertained.” Id. at 223. At a minimum, it seems clear that the majority’s pursuit of “the luxury of a complete record developed through discov *245 ery,” id. at 222, “careful analysis of intrinsically fact-bound issues,” id. at 223, and “exploration of the appellants’ duties under their contracts with the government,” id. at 223, contemplates full-fledged litigation that will inevitably require the substantial scrutiny of military affairs.
But this is not just another day at the ranch. This is an extraordinary case presenting issues that touch on the most sensitive aspects of military operations and intelligence. The majority’s proposed inquiry, “foeuse[d] on whether the contractor complied with the government’s specifications and instructions,” id. at 219, must perforce entail bringing the military personnel who gave those instructions before a court halfway around the world. The Supreme Court has long cautioned against “compelled depositions ... by military officers concerning the details of their military commands,” which will only “disrupt the military regime.” Stanley, 483 U.S. at 682-83, 107 S.Ct. 3054.
Domestically, this sort of “broad ranging discovery and the deposing of numerous persons ... can be peculiarly disruptive of effective government.” Harlow v. Fitzgerald, 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It carries the risks of “distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.” Id. at 816, 102 S.Ct. 2727. In the context of the battlefield, the consequences are geometrically more dire, since the plaintiffs seek information about the interrogation methods and intelligence gathering techniques critical to our nation’s success in combat. “Even a small chance that some court will order disclosure of a source’s identity could well impair intelligence gathering....” CIA v. Sims, 471 U.S. 159, 175, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985). I wonder how the majority expects an “inquiry focusefd] on whether the contractor complied with the government’s specifications and instructions,” ante at 219, to be resolved without hauling before the district court the military officers who gave those instructions, exposing our national security apparatus in direct contravention of the Supreme Court’s clear instructions to the contrary.
Because military contractors work at such close quarters with the military, judicial “inquiry into the civilian activities [will] have the same effect on military discipline as a direct inquiry into military judgments.” Johnson, 481 U.S. at 691 n. 11, 107 S.Ct. 2063. This is hardly a fanciful concern. Al-Quraishi, for instance, will likely seek discovery to validate the allegation in his complaint that “L-3 employees! ] and CACI employees conspired with certain military personnel to torture prisoners.” And the defendants are no better. CACI acknowledged at oral argument that, in order to produce sensitive military documents that would vindicate itself, it would push the discovery process against the military “as broadly as [it] possibly could.”
This quite plainly is the stuff of immunity, not just some affirmative defense. Despite the Supreme Court’s explicit admonition to the contrary, both parties frankly seek to “require members of the Armed Services” and their contractors “to testify in court as to each other’s decisions and actions” in an attempt to sort out “the degree of fault,” thereby undermining the private-public cooperation and discipline necessary for the execution of military operations. See Stencel Aero Eng’g Corp. v. United States, 431 U.S. 666, 673, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). Both parties to this suit propose to go rummaging through the most sensitive military files and documents, seeking to prove or disprove a broad-reaching conspiracy to con *246 duct the alleged illegal interrogations. I have no doubt that these proceedings -will quickly “devolve into an exercise in finger-pointing between the defendant contractor and the military, requiring extensive judicial probing of the government’s wartime policies.” Saleh, 580 F.3d at 8.
By pitting uniformed soldiers and military contractors against one another, we will only “hamper the war effort and bring aid and comfort to the enemy,” which will relish the opportunity to drag American soldiers into our “own civil courts” and thereby divert their “efforts and attention from the military offensive abroad to the legal defensive at home.” Johnson v. Eisentrager, 339 U.S. 763, 779, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). “[Tjhese cases are really indirect challenges to the actions of the U.S. military,” Saleh, 580 F.3d at 7, and it “would be difficult to devise more effective fettering of a field commander than to allow” the suits the majority encourages today. See Eisentrager, 339 U.S. at 779, 70 S.Ct. 936.
Rather than allow this court to address the merits of the immunity question and decide once and for all whether the demands of national security preclude this suit, the majority prefers sending this litigation back to a lone district judge with no more guidance than to say that he should keep his finger in the dike and avoid discovery that imperils national security. The ringing klaxons that the Supreme Court has sounded in this area do not permit this casual approach. By the time this case gets back to this court for consideration of the selfsame immunity questions that we could perfectly well address right now, the litigation process may well have done its damage.
These were precisely the sort of concerns that animated the Supreme Court’s extension of the collateral order doctrine to appeals pertaining to qualified immunity in Mitchell v. Forsyth, 472 U.S. 511, 524-30, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). That case makes clear that the touchstone of the collateral order doctrine is whether delayed review would impose “consequences ... not limited to liability for money damages.” Id. at 526, 105 S.Ct. 2806. Yet the majority refuses to even acknowledge that this case presents the same distinct dangers — and worse — that merited immediate appeal in Forsyth, preferring instead to act as if this were a typical personal injury case.
To justify this conclusion, the majority relies on semantics, ignoring the Supreme Court’s instruction that the collateral order doctrine is to be given a “practical rather than a technical construction.” Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).
First, the majority relies on a literal reading of the dictum that collateral appeals are reserved for “explicit statutory or constitutional guaranteed that trial will not occur.” Midland Asphalt Corp. v. United States, 489 U.S. 794, 801, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989). The majority cites this lonely line for the sweeping and staggering conclusion that the interests protected by Boyle and Saleh are “ipso facto, not immunity.” Ante at 217. But the Supreme Court has recognized that “explicit statutory or constitutional guarantee^” do not describe the whole of the collateral order doctrine. Mitchell v. Forsyth stands as an example of how “explicitness may not be needed for jurisdiction” to hear a collateral appeal. Digital Equip., 511 U.S. at 876, 114 S.Ct. 1992. What differentiates both qualified immunity and law-of-war immunity from the mass of claims that do not merit immediate review is their “good pedigree in public law.” Id. In other words, these immunities are distinct because although the interests *247 they protect are not specifically enshrined in legislative text, they are nonetheless vital to the protection of the common good, and serve more than the mere interest of a single individual in a favorable judgment.
Second, the majority examines Boyle with a microscopic eye, honing in on the fact that the case uses the word “liability” rather than “immunity.” See ante at 217-18. First, this observation is not even correct — both the majority and the dissent in Boyle also describe the result as “immunity.” See, e.g., Boyle, 487 U.S. at 510, 108 S.Ct. 2510 (“contractor immunity”); id. at 523 (Brennan, J., dissenting) (“contractor immunity”). Second, and more important, however, the Supreme Court has instructed that the courts of appeals should not “play word games with the concept of a ‘right not to be tried.’ ” Midland Asphalt, 489 U.S. at 801, 109 S.Ct. 1494. The majority recognizes this principle when convenient, see ante at 214 (quoting Midland Asphalt, 489 U.S. at 801, 109 S.Ct. 1494), but chooses to ignore it when parsing Boyle with exegetic precision, see ante at 217-18. All that is relevant to the inquiry before us is that the rationale for Boyle was the same desire to avoid the “inhibition of discretionary action” that made immediate appeals necessary in Mitchell v. Forsyth. Compare Boyle, 487 U.S. at 511-13, 108 S.Ct. 2510, with Forsyth, 472 U.S. at 525-26, 105 S.Ct. 2806.
Given the fact that these cases simply bristle with novel, unprecedented questions, their duration is likely to be measured in years. It will in all likelihood be a long time indeed before they ever again reach the court of appeals, especially in view of the fact that the vote here will operate as a disincentive for any future certified appeals under 28 U.S.C. § 1292(b). District courts have been given a signal from this court that we do not want to be bothered by these appeals no matter how significant the issues might be. Today’s opinion gives the district courts a green light to plunge without a scintilla of direction into the intractable difficulties and significant pitfalls of this litigation. The danger is precisely that which the collateral order doctrine is meant to forestall, namely the expenditure of years of litigation involving a succession of national security concerns in cases that plainly should be dismissed at the very outset. See Will, 546 U.S. at 353, 126 S.Ct. 952; Gough v. Perkowski, 694 F.2d 1140, 1145 (9th Cir.1982). If the collateral order doctrine has no role in saving resources and sparing wasted efforts in a context such as this, then I fear it has been largely eviscerated in those situations where it would be of most use.
I recognize that people on both sides of these questions have the noblest intentions in mind, but we should not be oblivious to the profound changes that are occurring. It was once the case that judges of all persuasions went to great lengths to restrain themselves from entering theatres of armed conflict with prescriptions of their own, and this was true whether the conflict was regional or worldwide in its dimensions. See, e.g., Holtzman v. Schlesinger, 414 U.S. 1304, 1309-10, 1315, 94 S.Ct. 1, 38 L.Ed.2d 18 (1973) (Marshall, Circuit Justice) (refusing to review air operations over Cambodia because, in part, “Justices of this Court have little or no information or expertise” with regard to sensitive military decisions and “are on treacherous ground indeed when [they] attempt judgments as to [the] wisdom or necessity” of executive military action); Eisentrager, 339 U.S. 763, 70 S.Ct. 936 (World War II); Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (World War II); The Prize Cases, 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1863) (The Civil War). But that era is ending. Perhaps it shall end, but how it ends is all important *248 and I hate to see it pass not through law but through judicial ukase. As a matter of policy, one may prefer these suits go forward, but as a matter of law, they should be forthwith dismissed.
Under the majority’s view of pertinent precedent, an officer denied qualified immunity for a wrongful arrest would be entitled to an immediate appeal of that decision, but the weighty questions of war and wartime policy at issue here must take their turn at the back of the line. What stands to be “irretrievably lost in the absence of an immediate appeal,” Richardson-Merrell Inc. v. Roller, 472 U.S. 424, 431, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985), is whether decisions as to how America protects herself can be scrutinized through novel applications of extraterritorial causes of action unauthorized by any body charged by our charter with protection of this country’s most vital security concerns. In allowing these suits to proceed, the majority has asserted for itself the responsibility of all others in our system: the right of Congress to authorize private tort actions challenging combatant activity overseas; the right of the executive to control wartime operations through its contractual and criminal law prerogatives; the right of the states not to assent to the extraterritorial application of their law; and the right (though not of constitutional dimension) of litigants and district courts to some notion of where this brave new world will lead. Perhaps this litigation is simply one of those small and tiny steps that weaken America only by increments and erode our constitutional structure only by degree. But I think this understates the matter. The touchstone of the collateral order doctrine is whether a trial “would imperil a substantial public interest” or “some particular value of a high order.” Will, 546 U.S. at 352, 126 S.Ct. 952. To some questions the answers should be so apparent as not to require iteration, and so it is here.
Judge Niemeyer and Judge Shedd have indicated that they join this opinion.

 The Al-Quraishi district court also declined to dismiss plaintiffs’ Alien Tort Statute claims because, in its judgment, "Plaintiffs’ claims constitute recognized violations of the law of nations, appropriately assertable against Defendants.” 728 F.Supp.2d at 715. Such *228 claims could be precluded by Kiobel v. Royal Dutch Petroleum Co. (No. 10-1491), in which the Supreme Court is expected to decide whether "the Alien Tort Statute ... provide[s] subject matter jurisdiction over claims against corporations,” Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 149 (2d Cir.2010), cert. granted, — U.S. —, 132 S.Ct. 472, 181 L.Ed.2d 292 (2011) (Mem), and "[wjhether and under what circumstances the Alien Tort Statute ... allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States,” — U.S. —, 132 S.Ct. 1738, 182 L.Ed.2d 270 (2012) (Mem).