PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA; JOHN C.
COX,
Plaintiffs-Appellees,

v.

No. 97-2045

COMMONWEALTH OF VIRGINIA,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-97-39-A)

Argued: January 28, 1998

Decided: March 24, 1998

Before LUTTIG and MICHAEL, Circuit Judges, and GOODWIN,
United States District Judge for the Southern District of
West Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judge Michael and Judge Goodwin joined.

_____

COUNSEL

ARGUED: Stephen Urban Baer, Assistant Attorney General, Rich-
mond, Virginia, for Appellant. Michael Scott Raab, Appellate Staff,
Civil Division, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellees. ON BRIEF: Richard Cullen, Attor-

ney General of Virginia, Richmond, Virginia, for Appellant. Frank W. Hunger, Assistant Attorney General, Helen F. Fahey, United States Attorney, Michael J. Singer, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

_____

## OPINION

LUTTIG, Circuit Judge:

The legislature for the Commonwealth of Virginia has authorized the Virginia Criminal Justice Services Board to establish training, registration, and licensing requirements for the private security services industry. See Va. Code Ann. § 9-182(B). Under Virginia law, any "private security services business" operating in Virginia must obtain a state license and any Virginia "private investigator" must register with the state.[1] To obtain a license, the business must pay an initial fee of $518 and an annual renewal fee of $250. The business must also secure a $25,000 surety bond or general liability insurance with a minimum coverage of $100,000 and $300,000, and retain a compliance agent, who must submit fingerprint cards, pay a $41 processing fee, and satisfy other criteria, including the completion of training programs at a state-approved school. See 6 Va. Admin. Code 20-170. The Board may deny any license application for "just cause." See 6 Va. Admin. Code 20-170-110(C).

_____

[1] A private security services business is defined as "any person engaged in the business of providing, or who undertakes to provide . . . private investigators . . . to another person under contract, express or implied." Va. Code Ann. § 9-183.1. A "private investigator" is defined as

> any person who engages in the business of, or accepts employment to make, investigations to obtain information on (i) crimes or civil wrongs; (ii) the location, disposition, or recovery of stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or property; or (iv) evidence to be used before any court, board, officer, or investigative committee.

Id.

2

To obtain a registration, the investigator must pay an initial fee of $76 and an annual renewal fee of $35. The applicant must also (1) be at least 18 years old; (2) complete the Board's initial and continuing training requirements; and (3) submit fingerprint cards and pay a $41 processing fee. See 6 Va. Admin. Code 20-170. The board may deny any registration for "just cause." 6 Va. Admin. Code 20-170-310. The Board regulations also prescribe numerous standards of conduct for compliance agents and private investigators, and the Board may sanction individuals who violate its standards. See 6 Va. Admin. Code 20-170-270, 970-1000. Those who violate Board regulations are subject to fines of up to $2,500, letters of reprimand, and/or license revocation, suspension or nonrenewal. See 6 Va. Admin. Code 20-170-1090. Apart from these civil sanctions, it is a misdemeanor for anyone to do business in Virginia without a required state registration or license. See Va. Code Ann. § 9-183.9.

In 1990, the Federal Bureau of Investigation (FBI) instituted the Background Investigation Contract Services (BICS) Program, a nationwide program under which the FBI hires former federal investigators as independent contractors to conduct federal background checks. The FBI created the BICS program pursuant to its authority to enter into contracts for goods and services under 48 C.F.R. § 1.601. The applicable provisions of the Federal Acquisition Regulations (FAR), which govern federal procurement of goods and services, 48 C.F.R. § 1 et seq., mandate that, before awarding a contract, the agency must affirmatively determine that the bidder is "responsible." 48 C.F.R. § 9.103(b). In order to make that responsibility determination, the agency must conclude that the contractor has, among other things, "adequate financial resources to perform the contract, or the ability to obtain them," 48 C.F.R. § 9.104-1(a); "a satisfactory performance record," 48 C.F.R. § 9.104-1(c); a"satisfactory record of integrity and business ethics," 48 C.F.R. § 9.104-1(d); and "the necessary organization, experience, . . . and technical skills, or the ability to obtain them," 48 C.F.R. § 9.104-1(e).

FAR further requires the agency to determine that the individual is "otherwise qualified and eligible." 48 C.F.R.§ 9.014-1(g). Because of the sensitivity of the work assigned to BICS contractors, the FBI has determined that to be "otherwise qualified and eligible," an individual must meet high standards of loyalty and trustworthiness. These stan-

3

dards are described in the FBI's "Statement of Work" for the BICS Program, a document routinely issued as part of the federal procurement process to provide information to prospective bidders. J.A. at 62-67. Among other things, the Statement of Work provides that BICS contractors must be former federal investigators who have experience conducting background investigations and who qualify for a Top Secret security clearance. J.A. at 62-63, 66.

Pursuant to the FAR standards, the FBI has hired approximately 165 BICS investigators to conduct background checks in Virginia. J.A. at 81. Many of the BICS investigators working in Virginia have obtained neither a Virginia private investigator's registration nor a Virginia private security services business license. Other BICS investigators have obtained a registration, but not a license. J.A. at 81. In January 1995, a BICS special investigator informed the head of the FBI's BICS unit, Mr. Francis Mulholland, that officials at the Virginia Criminal Justice Services Board believed that all BICS investigators were required to obtain state registrations and state licenses. J.A. at 83. The FBI then inquired about the state's position, and, in February 1995, following several conversations between state and FBI officials, an official at Virginia's Department of Criminal Justice Services wrote a letter to Mulholland, stating that"it remains our opinion that Special Investigators of the F.B.I. who function as independent contractors are in fact subject to the licensing and/or registration requirements for private security services business in Virginia." J.A. at 44. In July 1995, in response to a letter from the FBI's general counsel disputing the applicability of Virginia's regulations to BICS investigators, J.A. at 45-51, the Virginia Attorney General's Office sent a letter to the FBI reiterating the state's position that BICS investigators must comply with the state requirements, J.A. at 20-25.

In the fall of 1996, BICS investigators informed Mulholland that Virginia planned to initiate enforcement action against those unregistered and/or unlicensed BICS investigators working in Virginia. J.A. at 83. A number of BICS investigators, including appellee John C. Cox, who has worked in the BICS program since 1991 and performs substantially all of his BICS duties in Virginia, have declared that they will quit working for the FBI if they are forced to obtain a Virginia private investigator's registration or a Virginia private security services business license or both, rather than expend the time and

4

money necessary to comply with the state regulations. <u>See</u> J.A. at 30 (district court op.). Two BICS investigators have already been deterred from taking new assignments in Virginia, J.A. at 94-96, and the FBI believes that if the law is enforced it will face a manpower shortage or at least substantial delays in finding and ensuring the reliability of new investigators, J.A. at 82. This "adverse impact" on the BICS program, the FBI believes, "could negatively affect the national security of the United States." J.A. at 82.

The FBI and appellee Cox commenced this lawsuit in January 1997, requesting declaratory and injunctive relief to prevent Virginia from enforcing its registration and licensing provisions against BICS special investigators based on their work for the FBI.[2] The district court held that under Supreme Court case law, the challenged provisions of Virginia law were preempted because they"impose[d] additional requirements on individual contractors who have already been judged qualified by the FBI." J.A. at 41. The court determined that application of the challenged provisions to BICS investigators would permit the state effectively to "review . . . the FBI['s] determination" that BICS investigators are qualified to conduct background investigations. J.A. at 41. Accordingly, the court permanently enjoined Virginia from enforcing these provisions against Special Investigators in the BICS program. J.A. at 26.

We hold, as did the district court, that Supreme Court precedent precludes the application of Virginia's licensing and registration requirements to private investigators working solely for the FBI in the BICS program, and therefore affirm.[3] We believe that this holding is

_____

[2] The district court rejected Virginia's argument that the lawsuit was not justiciable, and held that there was a ripe case or controversy because of the statements by state officials, including the Attorney General, to the FBI that the state provisions apply to BICS investigators and because of the alleged report by a BICS investigator that Virginia was planning to enforce the challenged provisions. J.A. at 33-34.

[3] Because the Virginia Attorney General has repeatedly informed the FBI that it believes that BICS investigators are subject to its regulations and that it has the power to enforce those regulations against BICS investigators, we also agree with the district court that BICS investigators faced a reasonable threat of criminal prosecution and that there is thus

5

compelled by the Supreme Court's decision in <u>Leslie Miller</u> v. <u>Arkansas</u>, 352 U.S. 187 (1956) (per curiam), in which the Supreme Court held that an Arkansas licensing law could not be applied to a contractor who was hired by the federal government to build facilities at an air force base. Similar to FAR, the Armed Services Procurement Act (ASPA), under which the federal agency contracted in <u>Leslie Miller</u>, provided that the contract should be awarded "to that <u>responsible</u> bidder whose bid, conforming to the invitation for bids, will be the most advantageous to the Government, price and other factors considered." <u>Id</u>. at 188 (emphasis added) (citation omitted). And, like FAR, the Armed Services Procurement Regulations-- promulgated under the ASPA -- enumerated certain criteria for the agency to consider in determining whether a contractor was"responsible." The Arkansas licensing law listed similar factors for its Contractors Licensing Board to consider in determining whether to grant applicants a license.

The Supreme Court held that the Arkansas licensing law could not be applied to federal contractors because "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of `responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder." <u>Id</u>. at 190 (citations omitted). Thus, the Court held that the federal and state regulatory schemes "conflict[ed]" because the state could, in effect, declare "irresponsible" a contractor whom the federal govern-

_____

a ripe case or controversy for this court to adjudicate. <u>Cf</u>. <u>Public Utilities Comm'n</u> v. <u>United States</u>, 355 U.S. 534, 538 (1958) (allowing preenforcement review of a state regulation that required common carriers to receive state pre-approval before offering reduced shipping rates to the United States where the state "ha[d] plainly indicated an intent to enforce the Act"); <u>see also Mobil Oil Corp</u>. v. <u>Virginia</u>, 940 F.2d 73, 76 (4th Cir. 1991) (allowing preenforcement review of amendments to the Virginia Petroleum Products Franchise Act, which an oil company claimed were preempted, even though Virginia had not specifically indicated that it intended to enforce that statute against plaintiffs, because the Virginia "Attorney General ha[d] not . . . <u>disclaimed any intention of exercising her enforcement authority</u>") (emphasis added).

6

ment had declared "responsible."[4] See id. The Court also relied on the reasoning of Johnson v. State of Maryland, 254 U.S. 51, 57 (1920), that

> the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on. Such a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient. It is the duty of the Department to employ persons competent for their work and that duty it must be presumed has been performed. . . .

Leslie Miller, 352 U.S. at 190.

The Court reaffirmed the holding of Leslie Miller in Sperry v. Florida, 373 U.S. 379, 385 (1963). There, the Court held that "[a] State may not enforce licensing requirements which, though valid in the absence of federal regulation, give `the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions," and may not enforce requirements "which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress." Id. (footnote and citations omitted) (holding that federal regulations that specifically contemplated that non-lawyers be able to practice before the U.S. Patent Office prevented Florida from applying its "unauthorized practice of law" regulations to a nonlawyer in Florida registered to practice before the Patent Office).

_____

**4** Contrary to Virginia's intimation, see Appellant's Brief at 29, there is no indication that the Court believed that the fact that the federal contractor was being hired to work on federal facilities or on a federal enclave was in any way relevant to its decision.

7

The facts of Leslie Miller cannot be distinguished in any relevant way from the facts of this case. The federal regulatory schemes at issue are virtually identical in every important respect. FAR, like ASPA, expressly require agencies to determine that their contractors are "responsible." Both FAR and the implementing regulations for ASPA enumerate certain criteria for agencies to consider in making the "responsibility" determination, and, indeed, the criteria outlined in FAR are identical in many respects to those set forth in the ASPA regulations.**5** Moreover, just as ASPA directed the armed services to award contracts to "that responsible bidder whose bid, conforming to the invitation for bids, will be the most advantageous to the Government, price and other factors considered," Leslie Miller, 352 U.S. at 188, Congress has instructed federal agencies, including the FBI, to award contracts "to the responsible source whose proposal is most advantageous to the United States, considering only cost or price and the other factors included in the solicitation." 41 U.S.C. § 253b(d)(3). See also 41 U.S.C. § 414(1) (directing federal agencies to ensure that they receive a sufficient number of competitive proposals from "responsible sources" to fulfill the "Government's requirements (including performance and delivery schedules) at the lowest reasonable cost considering the nature of the property or service procured") (emphasis added). Thus, the FBI, like the armed services in Leslie Miller, is obliged to select the low-cost "responsible" bidder.**6**

_____

**5 Compare Leslie Miller**, 352 U.S. at 188 (listing the Armed Services Procurement criteria as, inter alia, whether the contractor "[h]as adequate financial resources, or ability to secure such resources"; "[h]as the necessary experience, organization, and technical qualifications, and has or can acquire the necessary facilities . . . to perform the proposed contract"; "[h]as a satisfactory record of performance, integrity, judgment, and skills"; and "[i]s otherwise qualified and eligible to receive an award under applicable laws and regulations"), with 48 C.F.R. § 9.104-1(a)-(g) (listing the FAR criteria as, inter alia, whether the contractor "ha[s] adequate financial resources to perform the contract, or the ability to obtain them"; "ha[s] the necessary organization, experience, . . . and technical skills, or the ability to obtain them"; "ha[s] a satisfactory performance record"; "ha[s] a satisfactory record of integrity and business ethics"; and "is otherwise qualified and eligible to receive an award under applicable laws and regulations").

**6** The similarity of the ASPA and FAR regulatory schemes reveals one of the many flaws in Virginia's argument that it may, without conflicting

8

Given the near identity of the federal and state regulatory schemes at issue in Leslie Miller and this case, Leslie Miller compels the conclusion that -- by adding to the qualifications necessary for an investigator to do background checks for the FBI -- the Virginia regulatory scheme frustrates the objectives of the federal procurement laws by allowing the state to "second-guess" the FBI's responsibility determination and by giving the state licensing board "a virtual power of review over the federal determination of `responsibility.'"[7] Indeed,

_____

with FAR, apply its regulations to the BICS investigators because Virginia's requirements do not interfere with open competition in the bidding process and the purpose of FAR is to ensure such competitive bidding -- not to ensure that federal agencies hire only contractors they deem "responsible." However, it is apparent that, just like the regulatory scheme at issue in Leslie Miller, FAR, in combination with the other federal procurement statutes cited above, requires not just that the federal government select the most "competitive" bid, but also that it first narrow the pool of potential bidders to those who are "responsible," as determined by the agency in accordance with the statutorily prescribed criteria. Thus, ensuring contractor responsibility and ensuring a competitive bidding process are both objectives of the federal procurement statutes, and allowing the state to second-guess the federal government's "responsibility determination" frustrates at least the first of these objectives.

[7] Rather than casting doubt on the continued validity of Leslie Miller, as Virginia contends, the Supreme Court's plurality disposition in North Dakota v. United States, 495 U.S. 423 (1990), confirms the correctness of our holding today. In North Dakota, a plurality of the Court held that North Dakota liquor control laws, which imposed reporting and labeling requirements on out-of-state suppliers who sold liquor to a federal enclave, did not violate the doctrine of intergovernmental immunity and were not preempted by federal regulations requiring the government to procure liquor from the most "competitive" source. However, notwithstanding their disagreement over whether Leslie Miller was a preemption or an intergovernmental immunity case, both the plurality and the dissenters cited Leslie Miller approvingly and reaffirmed its holding. See North Dakota, 495 U.S. at 435 n.7; 440 (plurality op.); id. at 451-53 (Brennan, J., concurring in part and dissenting in part).

In reaffirming Leslie Miller in the face of its holding that the North Dakota liquor control laws were a valid exercise of the state's power, the Court undoubtedly recognized the significant differences between North

9

Virginia's explicit rationale for enforcing its regulatory scheme against BICS investigators underscores the interference with federal objectives that would result if such enforcement were allowed. The Virginia Attorney General's Office emphasized in its letter to the FBI that Virginia wants to enforce its requirements against BICS investigators so that it can "ensure [their] <u>continued</u> competence," J.A. at 22 (emphasis in original), thus implying that the state believes that the FBI's assessment of its investigators' competence is inadequate because it does not ensure their continuing competence and confirming that the state intends to substitute its competency judgment for the FBI's. This rationale clearly runs afoul of the Supreme Court's holding that federal contractors cannot be required to satisfy state "'qualifications in addition to those that the [Federal] Government has pronounced sufficient.'" <u>Leslie Miller</u>, 352 U.S. at 190 (quoting <u>Johnson</u>, 254 U.S. at 57).

Accordingly, the judgment of the district court is affirmed.

<u>AFFIRMED</u>

_____

Dakota's laws and Arkansas' laws, insofar as their effects upon the decisional processes of the federal government are concerned. While the North Dakota regulations may have effectively altered the attractiveness of the bids placed by different suppliers through forced price increases, the regulations did not attempt to alter the criteria under which the federal government made its decision. Nor did those regulations prevent the federal government from selecting the bid it believed was most competitive or otherwise enable the state to second-guess the federal government's judgment as to who should supply the federal enclave. The contrast between the incidental effect of the North Dakota regulations on the federal government's decisional processes and the direct interference of the Arkansas regulations in <u>Leslie Miller</u> (and the Virginia regulations in the present case) with those processes is stark indeed.

10