IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

_____

No. 20-0766

_____

FILED

June 14, 2021

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

METRO TRISTATE, INC.,
Petitioner

v.

THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and
COMMUNITY PASTOR CARE, LLC,
Respondents

_____

Appeal from the Public Service Commission of West Virginia
Case Nos. 18-1315-MC-FC and 19-0006-MC-CC

AFFIRMED
_____

Submitted: February 9, 2021
Filed: June 14, 2021

David B. Hanna, Esq.
Thomas N. Hanna, Esq.
Charleston, West Virginia
Counsel for the Petitioner

Robert S. Pruett, Esq.
R. Booth Goodwin II, Esq.
Stephanie H. Daly, Esq.
Goodwin & Goodwin, LLP
Charleston, West Virginia
Counsel for Respondent
Community Pastor Care, LLC

Robert M. Adkins, Esq.
Jessica M. Lane, Esq.
Charleston, West Virginia
Counsel for Respondent
Public Service Commission of W. Va.

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "Preemption is a question of law reviewed *de novo*." Syl. pt. 1, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009).

2. "The Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law." Syl. pt. 1, *Cutright v. Metropolitan Life Ins. Co.*, 201 W. Va. 50, 491 S.E.2d 308 (1997).

3. "When it is argued that a state law is preempted by a federal law, the focus of analysis is upon congressional intent. Preemption is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Syl. pt. 4, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009).

4. "Although there can be no crystal-clear, distinctly-marked formula for determining whether a state statute is preempted, there are two ways in which preemption may be accomplished: expressly or impliedly." Syl. pt. 5, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009).

5. "There are two recognized types of implied preemption: field preemption and conflict preemption. Implied field preemption occurs where the scheme of federal regulation is so pervasive that it is reasonable to infer that Congress left no room for the states to supplement it. Implied conflict preemption occurs where compliance with both federal and state regulations is physically impossible, or where the state regulation is

i

an obstacle to the accomplishment or execution of congressional objectives." Syl. pt. 7, *Morgan v. Ford Motor Co*., 224 W. Va. 62, 680 S.E.2d 77 (2009).

6. Where the United States Department of Veterans Affairs determines that a contractor meets the federal qualifications set by Congress in 38 U.S.C. § 8127, the Public Service Commission may not exercise its authority and impose state-law qualifications that stand as an obstacle to the department's determination.

**HUTCHISON, Justice**:

In this appeal of an order from the West Virginia Public Service Commission ("the Commission"), the Commission ruled that its jurisdiction under state law to regulate a company was preempted by federal law. The company was operating in West Virginia solely as a contractor for a federal agency. More importantly, the federal agency was impelled to give the company the contract to meet a goal expressed by Congress in a federal law. The Commission determined that exercising jurisdiction over the company would create a conflict between state law and the federal law because it would impose an obstacle to the accomplishment of that congressional objective. As we discuss below, we find no error in the Commission's determination and conclude that its authority was preempted by federal law. Accordingly, we affirm its order.

## I. Factual and Procedural Background

The Public Service Commission has the authority to regulate the transportation of people by motor vehicles for hire on West Virginia's roads. *See* W. Va. Code § 24A-1-1 (1987). West Virginia law defines a company that transports passengers in a motor vehicle for hire over the highways of this State as a "common carrier by motor vehicle" or "contract carrier by motor vehicle." W. Va. Code § 24A-1-2 (2020).[1]

---

[1] West Virginia Code § 24A-1-2 (2020) contains the following definitions:

"Common carrier by motor vehicle" means any person who undertakes, whether directly or by lease or any other

Continued . . .

1

Furthermore, West Virginia law prohibits common carriers and contract carriers from operating on West Virginia's roads without meeting various requirements and receiving approval from the Commission. *See* W. Va. Code § 24A-2-2 (1939) ("No common carrier by motor vehicle shall operate any motor facility for transportation of either persons or property for hire on any public highway" without holding "a certificate as a common carrier"); W. Va. Code § 24A-3-3(a) (2020) ("It shall be unlawful for any contract carrier by motor vehicle to operate within this state without first having obtained from the commission a permit[.]").

This case concerns a contract for "non-emergency medical transportation" of passengers over the highways of this State on behalf of a federal agency, the United States Department of Veterans Affairs ("the VA"). The contract was to provide services for, and

---

arrangement, to transport passengers or property, or any class or classes of property, for the general public over the highways of this state by motor vehicles for hire, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail, water, or air, and of express or forwarding agencies, and leased or rented motor vehicles, with or without drivers;

"Contract carrier by motor vehicle" means any person not included within the definition of "common carrier by motor vehicle", who under special and individual contracts or agreements, and whether directly or by lease or any other arrangement, transports passengers or property over the highways in this state by motor vehicles for hire[.]

We note that the Legislature amended West Virginia Code § 24A-1-2 during the 2021 legislative session. *See* House Bill No. 2890. However, none of the changes appear to affect this case.

2

in the area covered by, the Huntington VA Medical Center.[2] Generally speaking, the VA provides veterans with non-emergency transportation to and from VA-supported clinics and medical facilities. The VA coordinates and provides the non-emergency transportation in a host of ways, including entering into contracts and paying private contractors (like the parties in this case) to provide transportation, using volunteer drivers, and sometimes providing drivers with vehicles donated or bought with VA grants. Any VA transportation contract is governed by federal law and regulations and is fully funded by the VA.

Petitioner Metro Tristate, Inc. ("Metro"), is an Ohio corporation authorized to do business in West Virginia. Metro has a permit from the Commission authorizing it to act as a "common carrier by motor vehicle" in West Virginia, and it transports passengers by taxi and limousine service throughout Cabell County and Wayne County, West Virginia. Additionally, for about fifteen years prior to September 2018, Metro had a contract with the Huntington VA Medical Center to provide non-emergency medical transportation of veterans to and from medical appointments.

---

[2] According to a memorandum from the contracting officer for the VA, the contract at issue requires the provision of "transportation services of veterans to and from their scheduled appointments at the VA medical center in Huntington, WV, as well as the Community Based Outpatient Clinics" in Charleston and Lenore, West Virginia; Prestonsburg, Kentucky; and Gallipolis, Ohio. Hence, the contract appears to involve the interstate transportation of veterans, and not merely intrastate travel solely upon the roads of West Virginia. However, the Commission did not consider the interstate nature of the contract to be dispositive when it found its authority was preempted. Accordingly, we also do not incorporate this fact into our analysis.

Respondent Community Pastor Care, LLC ("CPC"), is a South Carolina company. CPC does not have a permit from the Commission, and it has never been authorized by the Commission to operate as a common carrier or a contract carrier by motor vehicle in West Virginia. CPC has, however, been qualified by the VA as a "small business concern[] owned and controlled by [a] veteran[] with service-connected disabilities." 38 U.S.C. § 8127(a).[3] The VA calls a company like CPC a "Service Disabled Veteran Owned Small Business," a phrase it abbreviates to "SDVOSB."

On September 28, 2018, a contract specialist from the VA informed Metro that its non-emergency medical transportation contract was expiring on September 30th and would not be renewed. The contract specialist told Metro that CPC had been awarded the contract. The contract specialist later noted that the VA is required by federal law to give preference to an "SDVOSB," and said that CPC had received the contract because it was both an "SDVOSB" and was the lowest bidder for the contract.[4] The parties agree that Metro is not an "SDVOSB" as defined by the VA.

---

[3] *See* 15 U.S.C. § 632(q)(2) for a full definition of a "small business concern owned and controlled by service-disabled veterans."

[4] The contract specialist also noted that "at least two interested parties with SDVOSB status" participated in the bidding process, and Metro was not one of those. As we discuss later in this opinion, when two or more companies with "SDVOSB status" bid on a contract, the VA must limit consideration to only those bidders. Federal law provides that a VA contract specialist

> shall award contracts on the basis of competition restricted to .
> . . small business concerns owned and controlled by veterans

Continued . . .

4

On October 1, 2018, Metro filed this case with the Commission.[5] Metro asked that the Commission bar CPC from transporting VA passengers until it receives a permit from the Commission.

CPC answered Metro's complaint and admitted it has no Commission-provided authority to transport passengers.[6] However, CPC asserted that its operations in West Virginia consist exclusively of non-emergency medical transportation pursuant to a contract with the VA. CPC argued that the Commission lacked authority to regulate the non-emergency medical transportation of veterans exclusively on behalf of the VA under

> with service-connected disabilities if the contracting officer has a reasonable expectation that two or more small business concerns . . . owned and controlled by veterans with service-connected disabilities will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States.

38 U.S.C. § 8127(d).

[5] Before the Commission, the case was styled *Metro Tristate, Inc. v. Community Pastor Care, LLC*, PSC Case No. 18-1315-MC-FC.

[6] On January 4, 2019, CPC filed a separate case with the Commission: an application to operate as a contract carrier in West Virginia solely to provide non-emergency medical transportation of veterans to and from VA facilities operated by the Huntington VA Medical Center. *See Community Pastor Care, LLC, Application for permit to operate as a contract carrier in the transportation of passengers for the Department of Veterans Affairs in Cabell County*, PSC Case No. 19-0006-MC-CC. Metro intervened in CPC's application process and asked the Commission to order CPC to cease operations in West Virginia. The Commission subsequently consolidated CPC's application claim with Metro's original action (PSC Case No. 18-1315-MC-FC) and resolved both cases with the preemption order now being appealed.

the Supremacy Clause of the United States Constitution.[7] CPC asserted that the Commission's state-law jurisdiction was preempted by federal law and moved to dismiss Metro's complaint.

An ALJ conducted a hearing and issued a recommended decision to the Commission on September 4, 2019. The ALJ recommended that the Commission had no jurisdiction to regulate intrastate transportation services procured by the VA under the Supremacy Clause, because the Commission's state-based regulatory mechanism conflicted with the federal government's contracting goals. Metro objected to the recommended decision.

On September 4, 2020, the Commission entered an order that rejected Metro's objections and concluded that the Commission's jurisdiction to regulate CPC was preempted by federal law. The Commission perceived that federal law requires the VA to contract with small businesses owned by veterans with service-connected disabilities, and it found that the Commission's exercise of jurisdiction over CPC would impair that VA

---

[7] The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI, cl. 2.

goal. The Commission concluded it had no "jurisdiction to regulate market entry of non-emergency medical transportation services for veterans provided exclusively for the VA by a . . . SDVOSB [service-disabled, veteran-owned small business] under contract with the VA because implied conflict preemption applies."[8] Accordingly, the Commission dismissed the case.

Metro then appealed the Commission's order to this Court.

## II. Standard of Review

This Court usually affords great deference to orders of the Commission, given that most cases involve "complex issues and arcane concepts that fall within the special competence of the Commission and are governed by Commission precedent." *W. Va. Action Grp. v. Pub. Serv. Comm'n of W. Va.*, 233 W. Va. 327, 331-32, 758 S.E.2d 254, 258-59 (2014) (per curiam). However, in this appeal we are asked to consider whether the Commission's jurisdiction to enforce certain state laws is impliedly preempted by a conflict with federal law. Our standard of review is simple: "Preemption is a question of law reviewed *de novo.*" Syl. pt. 1, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009).

---

[8] The Chairman of the Commission dissented and argued that the Commission could exercise jurisdiction because there is no explicit language in federal law and "no explicit agency regulation or pronouncement that state law governing contract carriers should be preempted." Further, the Chairman was of the opinion that conflict preemption also did not exist, and she suggested that the Commission's decision was wrong and "at best hangs on a very thin reed[.]"

7

## III. Discussion

Before turning to the issue(s) raised in Metro's briefs to this Court, we first note that Metro's opening brief failed to comply with Rule 10(c) of the West Virginia Rules of Appellate Procedure. Rule 10(c) provides that "to the fullest extent possible, the petitioner's brief *shall* contain the following sections in the order indicated." (Emphasis added.) The rule goes on to specify, in order, nine different sections that must follow the cover page starting with a table of contents and ending with a certificate of service. Rule 10(c)(3) requires that a petitioner's brief "open[] with a list of the assignments of error that are presented for review, expressed in terms and circumstances of the case but without unnecessary detail." "The practice of opening a brief with a series of assignments of error serves to alert the Court to the singular issue or issues that may have adversely affected the outcome before the trial court." *Wilson v. Kerr*, No. 19-0933, 2020 WL 7391150, at *3 (W. Va. Dec. 16, 2020) (memorandum decision). By clearly articulating the errors alleged to have occurred in the lower tribunal, the petitioner "allows a respondent to address the focused issue, confident that he did not fail to discern a determinative argument buried in petitioner's prose." *Id.* Moreover, clearly defining the issues presented averts the danger that "the Court and respondent may discern different issues from a petitioner's lengthy, free-flowing argument." *Id.*[9]

---

[9] In *Wilson v. Kerr*, this Court refused to consider a case where petitioner filed a thirty-two-page appellate brief yet failed to list a single assignment of error. We refused to overlook the failure of petitioner "to succinctly state the point at which she

Continued . . .

While the petitioner's brief must open with a list of the questions presented for review, Rule 10(c)(7) mandates that the brief contain an argument section which has separate, distinct contentions corresponding to each of the aforementioned assignments of error:

> The brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on, *under headings that correspond with the assignments of error*. The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

Rule 10(c)(7) (emphasis added). Rule 10(c) is clear: a brief to this Court must contain a list of the succinctly drawn assignments of error, and it must also contain an argument section organized under headings that correspond with each assignment of error.[10]

---

believes the lower court stumbled." 2020 WL 7391150, at *3. We dismissed the appeal and concluded

> that substantial justice is not served when the Court is asked to perform this most basic function of a petitioner's appellate practice, and we caution the bar that we are loath to put respondents in the difficult position of identifying assignments of error that should have been carefully articulated by opposing counsel.

*Id.*

[10] Of course, the "to the fullest extent possible" language at the beginning of Rule 10(c) indicates that this Court will permit some flexibility in the drafting of a brief if circumstances require. For instance, if substantially the same question is raised by more

Continued . . .

Metro's petition for appeal opens with an outline of six assignments of error, each of which broadly contends that a conclusion of law in the Commission's order was error.[11] However, the argument section of Metro's petition abandons the six assignments

than one asserted assignment of error, under Rule 10(c)(7) those errors may be grouped together and supported by one argument.

Still, Rule 10(c) dictates the brief's structure. Each subsection of the argument section must have a heading that mirrors an assignment of error, and then beneath that heading there should be an explanation of the question the party wants the Court to resolve, a description of the applicable rule(s) of law, application of that law to the facts of record, and the conclusion the party believes logically and inevitably follows.

[11] Metro's six assignments of error are couched in terms of the Commission's "majority" opinion. The six assignments state:

> 1. The Majority erred in determining that state regulation of market entry of Veteran-Owned Small Businesses ("VOSB") or Service Disabled Veteran-Owned Small Businesses ("SDVOSB") seeking to contract with the VA to provide NEMT for veterans would stand as an obstacle and interfere with the accomplishment of the objectives of the Veterans Benefits Act. Majority Opinion, *Conclusion of Law No. 2*.

> 2. The Majority erred in determining that Commission permitting requirements for CPC's operation as a SDVOSB are preempted by federal law. Majority Opinion, *Conclusion of Law No. 4*.

> 3. The Majority erred in determining that Commission state contract carrier permitting requirement[s] to protect existing common carrier services interferes with federal contracting goals by applying state regulatory requirements that could leave the VA with no VOSBs or SDVOSBs to choose in West Virginia. Majority Opinion, *Conclusion of Law No. 5*.

> 4. The Majority erred in determining that the Commission does not have jurisdiction to regulate market entry of non-emergency medical transportation services for veterans provided exclusively for the VA by a VOSB or SDVOSB

Continued . . .

of error in favor of four subsections, none of which correlates with any assignment of error. Worse, aside from the brief's opening, the six assignments of error are mentioned nowhere else. It was, therefore, a challenge for both this Court and the respondents to understand the connection between the errors initially alleged by the petitioner and the various and sundry contentions later assembled in the argument section of the brief. Because of Metro's "lengthy, free-flowing argument" that failed to focus on the errors asserted at the opening of the brief, CPC's response brief – while written well – is structured in a "whack-a-mole" format that tries to address the varied contentions sprinkled throughout Metro's brief.

Rule 10 of the Rules of Appellate Procedure was designed to simplify the appeal process and to help lawyers file clear, concise, and organized briefs. "Although we liberally construe briefs in determining issues presented for review," *State v. LaRock*, 196

---

under contract with the VA because implied preemption applies. Majority Opinion, *Conclusion of Law No. 6*.

5. The Majority erred in determining that because it is the federal objective to increase contracting opportunities for VOSBs and SDVOSBs, implied conflict preemption does not apply in the case of a contract carrier that is not a qualified VOSB or SDVOSB. Majority Opinion, *Conclusion of Law No. 7*.

6. The Majority erred in determining that the Exceptions filed by Metro Tristate, Inc. should be denied and the Recommended Decision, as modified and supplemented by the Majority Opinion, should be adopted as the Final Order of the Commission. Majority Opinion, *Conclusion of Law No. 8*.

W. Va. 294, 302, 470 S.E.2d 613, 621 (1996), we have often said that "a lawyer has a duty to plead and prove his case in accordance with established court rules." *State, Dep't of Health v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995). Lawyers who fail to follow our appellate rules inevitably generate a disjointed, poorly written, or difficult to understand brief, and they should not anticipate that this Court will find or make their arguments for them. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).[12]

---

[12] Additionally, appellate courts frequently refuse to address issues that the parties fail to develop in their brief – something we often refer to as a "skeletal" assertion. Indeed, "casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." *State v. Lilly*, 194 W. Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n.16 (1995) (citation omitted). Stated succinctly, this Court may decline to address "issues which are not raised, and those mentioned only in passing but [which] are not supported with pertinent authority[.]" *State v. LaRock*, 196 W. Va. at 302, 470 S.E.2d at 621. As one court said,

> Few principles are more a part of the warp and woof of appellate practice than the principle that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. . . . This principle imposes on litigants an unflagging obligation to spell out their contentions squarely and distinctly, or else forever hold their peace.

*Casillas-Diaz v. Palau*, 463 F.3d 77, 83 (1st Cir. 2006) (cleaned up).

In the instant case, petitioner Metro's argument, while unclear, was not perfunctory. The argument section contains a discussion of various statutes and cases, and it applies that law to the facts. The problem with the brief is that the arguments are disassociated from the errors assigned at the beginning of the brief.

However, "despite our frequent admonition to the bar that 'truffle hunting' is not within this Court's remit," *Wilkinson v. W. Va. State Off. of Governor*, ___ W. Va. ___, ___, 857 S.E.2d 599, 610 (2021), we have examined and distilled the briefs and arguments of both parties, as well as the record. From this examination, we discern that Metro's opening brief has effectively raised only one question for this Court: Did the Commission err when it determined its authority to regulate CPC, a small business owned by a service-disabled veteran, was preempted because the act of regulation would serve as an obstacle to and interfere with congressional goals, namely to encourage the VA to contract with small businesses owned by service-disabled veterans?

We begin by examining the doctrine of preemption. This Court has interpreted the doctrine of preemption to mean that "[t]he Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law." Syllabus Point 1, *Cutright v. Metropolitan Life Ins. Co.,* 201 W. Va. 50, 491 S.E.2d 308 (1997). Principles of federalism dictate that there is a presumption that Congress does not intend to preempt state law, especially when it legislates in an area that states traditionally occupy. *See* Syl. pt. 3, *Morgan*, 224 W. Va. at 65, 680 S.E.2d at 80. "When it is argued that a state law is preempted by a federal law, the focus of analysis is upon congressional intent. Preemption is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Id.*, Syl. pt. 4; *accord, Retail Clerks Int'l Ass'n, Loc. 1625, AFL-CIO v.*

13

*Schermerhorn*, 375 U.S. 96, 103 (1963) (In every preemption case, "[t]he purpose of Congress is the ultimate touchstone."). Congressional intent

> primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (cleaned up).

"Although there can be no crystal-clear, distinctly-marked formula for determining whether a state statute is preempted, there are two ways in which preemption may be accomplished: expressly or impliedly." Syl. pt. 5, *Morgan*, 224 W. Va. at 65, 680 S.E.2d at 80. The Commission found that its authority to regulate respondent CPC was impliedly preempted. There are two types of implied preemption:

> field preemption and conflict preemption. Implied field preemption occurs where the scheme of federal regulation is so pervasive that it is reasonable to infer that Congress left no room for the states to supplement it. Implied conflict preemption occurs where compliance with both federal and state regulations is physically impossible, or where the state regulation is an obstacle to the accomplishment or execution of congressional objectives.

*Id.*, Syl. pt. 7. Neither the parties nor the Commission assert the existence of field preemption. Instead, applying Syllabus Point 7 of *Morgan*, the Commission found its jurisdiction was preempted by implied conflict preemption.

Hence, in the instant case, we consider whether the Commission's authority to enforce state law was preempted because the act of enforcement would be an obstacle to the accomplishment or execution of a congressional objective. Conflict preemption arises from a direct clash between state and federal law, and "[c]onventional conflict pre-emption principles require pre-emption 'where . . . state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Boggs v. Boggs*, 520 U.S. 833, 844 (1997) (*quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). Stated concisely, state laws are preempted when "they would upset federal legislative choices[.]" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 551 (2001). Under an implied conflict preemption analysis, federal statutory or policy language explicitly signaling an intent to preempt state law is *not* necessary.[13]

At issue in this case is respondent CPC's contract with the VA, and we must examine whether the Commission's assertion of jurisdiction will be an obstacle to the

---

[13] Both Metro and the dissenting opinion of the Commission's chairman devote much attention to the lack of an explicit congressional or federal agency statement of intent in the VA's contract procurement regulations to preempt the application of state motor carrier laws, or any other state laws, to small businesses owned by service-disabled veterans. If such a statement of intent did exist, then the proper analysis would be whether Congress or the federal agency "through specific and plain language, acted within constitutional limits and explicitly intended to preempt the specific field covered by state law." Syl. pt. 6, *Morgan*, 224 W. Va. at 65, 680 S.E.2d at 80. However, nothing in the federal procurement system (known as the Federal Acquisition Regulation ("FAR") system) "expressly preempts state licensing laws and regulations. . . . Thus, if state licensing laws are preempted by FAR's responsibility requirements, then it must be on account of an implied preemption." David S. Rubenstein, *State Regulation of Federal Contractors: Three Puzzles of Procurement Preemption*, 11 UC Irvine L. Rev. 207, 233, 236 (2020).

congressional purposes underlying that federal contract. The facts of this case are unique because, unlike a typical taxi or limousine provider (such as Metro) that offers passenger transportation to the general public as well as the VA, CPC is performing services in West Virginia solely for the VA as a VA contractor. The VA chose CPC to provide non-emergency medical transportation, in part, because legislation adopted by Congress required that the VA give preference to small businesses owned by veterans with service-connected disabilities. Congress adopted the requirement "to increase contracting opportunities for . . . small business concerns owned and controlled by veterans with service-connected disabilities." 38 U.S.C. § 8127(a).[14]

---

[14] Further, the VA contract dictates how CPC is to provide veterans with non-emergency medical transport to VA facilities. For instance, the VA contract establishes safety requirements for vehicles used by CPC, such as requirements that: "All vehicles used to transport patients in wheelchairs must be equipped with a wheelchair lift;" "A fire extinguisher shall be in each vehicle and checked monthly to ensure it is in proper working condition;" "All vehicles shall be a smoke-free environment;" "All vehicles will be inspected by VA personnel. Any vehicle that does not meet the requirements of this contract cannot be utilized in the performance of this contract;" that vehicles must have "a certificate of insurance" saying that any change in the policy "shall not be effective unless -30- days written notice of cancellation or change is furnished to" the VA; and each vehicle must be equipped "with either a cellular phone or two-way radio for communication in emergency situations." The VA contract also establishes safety requirements for CPC employees, and requires every driver be trained in "Defensive driving/proper vehicle operation ensuring safety," "First aid and CPR/recognition of patient exhibiting medical distress," "Universal Precautions (location and availability of protective gear, availability of hepatitis injections, etc.)," "Use of seat belts and all adaptive equipment," "Proper lifting techniques," and "Confidentiality of patient, in accordance with the Privacy Act of 1974." The contract also imposes certain wage requirements, and it requires that CPC maintain "[a] record of each employee as to character and physical capabilities of performing the duties of driver or attendant." The parties do not discuss whether any of these VA-imposed requirements conflict with any of the state statutes or regulations governing the Commission.

16

Our analysis begins with an examination of how the Supreme Court of the United States has applied the rules of implied conflict preemption to preempt State attempts to regulate federal contractors. The Supreme Court has repeatedly said that the Supremacy Clause precludes States from imposing their own requirements on individuals working solely as federal contractors and chosen according to federal requirements. A century ago, in *Johnson v. State of Maryland*, 254 U.S. 51 (1920), the Supreme Court considered a case where a State sought to impose licensing requirements on a federal employee. A worker for the United States Post Office Department was driving a government truck on a public highway in Maryland when he was arrested, tried, convicted and fined "for so driving without having obtained a license from the State." *Id.* at 55. The Supreme Court reversed the conviction and found that a State may not impose regulations that "interrupt the acts of the general government itself." *Id.* Moreover, when the federal government chooses to hire what it deems a "competent" employee, the *Johnson* Court concluded that a State may not impose regulatory requirements that impose separate or additional "competency" requirements. The Supreme Court stated

> that the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on. Such a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient. It is the duty of the Department to employ persons competent for their work and that duty it must be presumed has been performed.

17

*Id.* at 57.

In *Leslie Miller, Inc. v. State of Arkansas*, 352 U.S. 187 (1956), the Supreme Court extended its preemption holding in *Johnson* from federal employees to federal contractors. The United States Air Force solicited bids for the construction of government facilities in Arkansas. A federal law adopted by Congress required that bids could only be submitted by a "responsible bidder," and regulations promulgated under the law "set forth a list of guiding considerations[] defining a responsible contractor[.]" *Id.* at 188-89. A construction contractor submitted a bid to the Air Force, the bid was accepted, and the contractor began work under the contract. The State of Arkansas, however, tried to impose its own regulations on the contractor, and the State charged and convicted the contractor with working as a contractor "without having obtained a license under Arkansas law for such activity from its Contractors Licensing Board." *Id.* at 188.

On appeal, the Supreme Court reversed the conviction and found that federal law preempted the State's authority to impose its own contractor regulations, and for a simple reason: through the act of regulating, the State could declare "irresponsible" a contractor whom a federal agency had previously declared "responsible." The *Leslie Miller* Court concluded that preemption arose from the conflict between the

> license requirement which Arkansas places on a federal contractor and the action which Congress and the Department of Defense have taken to insure the reliability of persons and companies contracting with the Federal Government. Subjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of

18

> "responsibility" and would thus frustrate the expressed federal
> policy of selecting the lowest responsible bidder.

*Id.* at 190; *accord*, *Gartrell Const. Inc. v. Aubry*, 940 F.2d 437, 439 (9th Cir. 1991) (finding California's authority to require a general construction contractor, working exclusively for the United States government, to obtain a state contractor's license was preempted by federal procurement laws).

The Supreme Court reaffirmed its holding in *Leslie Miller* in *Sperry v. State of Florida*, 373 U.S. 379 (1963). There, the Commissioner of the United States Patent Office authorized a lawyer to practice before the Patent Office, and he did so guided by federal regulations establishing the qualifications for patent lawyers. However, the lawyer maintained an office in the State of Florida and solicited Patent Office business there without becoming a member of the Florida State Bar. The State enjoined the lawyer from practicing before the Patent Office until he became a member. The Supreme Court reversed, vacated Florida's injunction, and found that the State's authority to regulate lawyers was preempted by federal law, to the extent the State's actions interfered with the requirements established by the federal government for patent lawyers. The Supreme Court said:

> A State may not enforce licensing requirements which, though valid in the absence of federal regulation, give the State's licensing board a virtual power of review over the federal determination that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress.

*Id.* at 385 (quotations and footnotes omitted).

A case from the United States Court of Appeals for the Fourth Circuit demonstrates the application of the preemption rule expressed in *Johnson*, *Leslie Miller*, and *Sperry*. In *United States v. Commonwealth of Virginia*, 139 F.3d 984 (4th Cir. 1998), the Federal Bureau of Investigation ("FBI") exercised its statutory authority to contract, and it created a contract program to hire independent contractors to conduct federal background checks. *Id.* at 986. Federal regulations required any bidder on the contract to be "responsible," and the regulations set forth various guidelines for the FBI to assess in making that responsibility determination. *Id.* Thereafter, the FBI contracted with individuals who it found to be qualified to conduct federal background investigations in Virginia. The Commonwealth of Virginia, however, repeatedly insisted that each independent contractor was a "private investigator" required to register, pay a fee, and meet the "private security services" training and licensing requirements set by the Virginia Criminal Justice Services Board. *Id.* at 986-87.

The FBI and one contractor filed suit "to prevent Virginia from enforcing its registration and licensing provisions against . . . [the contractors working as] special investigators based on their work for the FBI." *Id.* at 987. The district court granted an injunction against the State after finding that Virginia law imposed "additional requirements on individual contractors who have already been judged qualified by the FBI." *Id.*

On appeal, the Court of Appeals affirmed the district court's ruling that Virginia's authority to impose its private contractor licensing requirements was preempted

20

by federal law, to the extent Virginia sought to regulate contractors working exclusively for the FBI. The Court of Appeals examined the Supreme Court's preemption rulings and likewise concluded that Virginia's authority to regulate private investigators conflicted with the FBI's goal of hiring qualified contractors to perform FBI work. The Court of Appeals found that

> by adding to the qualifications necessary for an investigator to do background checks for the FBI[,] the Virginia regulatory scheme frustrates the objectives of the federal procurement laws by allowing the state to "second-guess" the FBI's responsibility determination and by giving the state licensing board "a virtual power of review over the federal determination of 'responsibility.'"

*Id.* at 989 (quoting *Leslie Miller*, 352 U.S. at 190).

One final case demonstrates the application of implied conflict preemption rules, and it does so on facts similar to the case at bar. In *Lafferty Enterprises, Inc. v. Commonwealth*, 572 S.W.3d 85 (Ky. Ct. App. 2019), our sister State, the Commonwealth of Kentucky, addressed a contract between the Huntington VA Medical Center and an ambulance company. The VA contract involved the transportation of veterans living in eleven eastern Kentucky counties to and from VA facilities. The VA hired Jan-Care, a West Virginia ambulance company that was licensed to operate in West Virginia but not licensed in Kentucky. The Kentucky Cabinet for Health and Family Services found that Jan-Care violated Kentucky's certificate of need licensing laws and imposed a fine, and the Kentucky Board of Emergency Medical Services ordered Jan-Care to cease operating in Kentucky without a license. Jan-Care filed an action in state court, and that court

21

concluded that Kentucky's laws regulating ambulances were, on these facts, preempted by federal law.

On appeal, the Kentucky Court of Appeals affirmed and found Kentucky's regulatory authority over the federal ambulance contractor was blocked under an implied conflict preemption analysis. The record showed that the VA contracted with Jan-Care after determining it met federal contracting requirements. The Kentucky court concluded:

> Enforcing Kentucky's [certificate of need] and licensure laws would deprive the VA of its right to select the provider of its choice and would effectively allow the Commonwealth of Kentucky to select the provider instead. There is no doubt that requiring Jan-Care – as the VA's chosen provider – to meet Kentucky requirements would frustrate the VA's objectives. Since there is a clear conflict, federal procurement laws . . . as they pertain to the VA contracts for ambulance services to veteran patients of its facility, preempt Kentucky's [certificate of need] and licensing laws.

*Id.* at 92.[15] In sum, the Kentucky court found that Kentucky's "laws as they apply to VA ambulance service contractors" stood as an obstacle to, and were therefore preempted by, federal contract procurement laws. *Id*. at 93.

---

[15] The Kentucky court noted that the contract between the VA and Jan-Care contained a clause saying that the "contractor shall obtain all necessary licenses and/or permits required to perform this work." *Lafferty Enterprises*, 572 S.W.3d at 87. A subsequent contract between the VA and Jan-Care said that "[a]ll vehicles, personnel, and services rendered by the Contractor shall conform to all federal, state, and local statutes, rules, and regulations; specifically, for the states of West Virginia, Kentucky and Ohio." *Id*. at 89. The court rejected the argument by Kentucky that it could enforce these contract provisions, finding that "to the extent the . . . [VA] contract[s] impose any Kentucky

Continued . . .

22

The conflict preemption principle guiding our decision is, therefore, that when a federal agency determines that a contractor meets some federal contract or procurement qualification set by Congress, a state agency may not exercise its authority and impose additional state-law qualifications that stand as an obstacle to that federal agency determination and, more specifically, to the qualifications set by Congress. If a contractor chosen by "the United States must desist from performance of their duties until they satisfy a state officer of their competence, qualifications are added to those which the federal government has pronounced sufficient." *Elec. Const. Co. v. Flickinger*, 485 P.2d 547, 549 (Ariz. 1971). Hence, a State is barred from imposing additional qualifications not contemplated by Congress upon an entity operating solely as a federal contractor, particularly when those qualifications will compromise the federal agency's choice of that entity to complete a federal contract.

---

licensure requirements upon Jan-Care, those are matters for the VA to enforce as a party to the contracts, should it so choose, not [the State.]" *Id.* at 93.

In the instant case, Metro similarly points out that VA regulations require a contractor to "obtain and keep current any and all required permits, licenses, and charters, required to operate the business," 13 C.F.R. § 125.13(g), and that the VA contract requires CPC to "meet all requirements of Federal, State or City codes regarding operation of vehicles required for this contract." Like the Kentucky court in *Lafferty Enterprises*, we reject Metro's assertion that these federal requirements are binding upon the Commission or that they override principles of preemption. To the extent that the VA's contract or the VA's regulations impose any West Virginia licensure requirements upon CPC, those matters are for the VA to enforce as a party to the contracts, should it choose, and not Metro or the Commission.

23

We now turn to the qualifications Congress imposed upon the VA in choosing a contractor, and the intent behind those qualifications. In 2006, Congress enacted the Veteran's Benefits, Health Care, and Information Technology Act (the "VBA") (38 U.S.C. § 1801 *et seq.*). As part of the VBA, Congress adopted 38 U.S.C. § 8127 ("Section 8127") with a clearly stated purpose: "to increase contracting opportunities for . . . small business concerns owned and controlled by veterans with service-connected disabilities[.]" 38 U.S.C. § 8127(a). To achieve this purpose, Section 8127 mandates that the VA give first priority to what the VA calls a "Service Disabled Veteran Owned Small Business" ("SDVOSB") over any other bidder on the contract. Specifically, Section 8127(h) requires the VA to give preference in "awarding contracts to small business concerns . . . in the following order of priority:"

> (1) Contracts awarded . . . to *small business concerns owned and controlled by veterans with service-connected disabilities*.
>
> (2) Contracts awarded . . . to small business concerns owned and controlled by veterans that are not covered by paragraph (1).
>
> (3) Contracts awarded pursuant to--
>
> (A) section 8(a) of the Small Business Act (15 U.S.C. 637(a)); or
>
> (B) section 31 of such Act (15 U.S.C. 657a).
>
> (4) Contracts awarded pursuant to any other small business contracting preference.

38 U.S.C. § 8127(h) (emphasis added).

24

Furthermore, in circumstances specified in Section 8127(d), Congress constrained the VA and restricted its ability to award contracts to a business that is not qualified as an "SDVOSB." Section 8127(d) provides that if two or more small businesses owned by veterans with service-connected disabilities submit bids for a contract, then the VA "*shall* award contracts on the basis of competition restricted to . . . small business concerns owned and controlled by veterans with service-connected disabilities[.]" 38 U.S.C. § 8127(d)(1) (emphasis added). The record in this case indicates that at least two small businesses owned by veterans with service-connected disabilities (including respondent CPC) submitted bids for the VA non-emergency transportation contract at issue in this case. Conversely, the record is clear that petitioner Metro is not a service-disabled veteran-owned small business. *See supra* footnote 4.

The application of the requirements of Section 8127 are not optional. The Supreme Court has stated that the statute requires the VA "to award contracts to veteran-owned small businesses." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016). In *Kingdomware*, the Supreme Court ruled that Section 8127 is mandatory and applies to all of the VA's contracting determinations. As another court noted in applying Section 8127, the statute

> requires the VA to purchase goods and services from qualified veteran-owned businesses, if available. The VBA was intended to "increase contracting opportunities for small business concerns owned and controlled by veterans," [and] the VBA directs . . . the Department of Veteran's Affairs ("the VA") to "award contracts on the basis of competition restricted to small business concerns owned and controlled by veterans . . . if the contracting officer has a reasonable expectation that

25

two or more [such businesses] will submit offers and that the award can be made at a fair and reasonable price."

*Bayaud Enterprises, Inc. v. U.S. Dep't of Veteran's Affs*., 440 F. Supp. 3d 1230, 1234 (D. Colo. 2020) (quoting 38 U.S.C. § 8127(d)).

Assembling these principles in the context of this case, we hold that where the United States Department of Veterans Affairs determines that a contractor meets the federal qualifications set by Congress in 38 U.S.C. § 8127, the Public Service Commission may not exercise its authority and impose state-law qualifications that stand as an obstacle to the department's determination.

In the instant case, respondent CPC met the definition of a small business concern owned and controlled by a veteran with a service-connected disability, as that phrase is used in Section 8127. Acting under the qualifications set by Section 8127, the Huntington VA Medical Center determined that CPC should be awarded the non-emergency transportation contract because CPC was qualified to perform the contract; because it was a small business owned by a veteran with a service-connected disability; and because it was the lowest bidder and could perform the contract "at a fair and reasonable price that offers best value to the United States." 38 U.S.C. § 8127(d). On this record, if the Commission were to exercise jurisdiction and impose its common- or contract-carrier regulations, then the Commission would be imposing additional qualifications onto the VA's choice of a contractor. Moreover, the VA's chosen contractor would have to desist from the performance of its duties for the federal government until it

satisfied the Commission of its qualifications under state law, when the federal government has already concluded the contractor has met the qualifications established by Congress. In other words, if the Commission were to exercise authority over CPC, it would be adding to the VA's qualifications necessary for a contractor to provide non-emergency medical transportation. Hence, the Commission's assertion of its regulatory scheme would improperly place the Commission in a position to "second guess" the VA's choice of contractor and would, therefore, be an obstacle to the accomplishment or execution of the congressional goals contained within the VA's procurement laws.

One additional point bears mentioning, and that regards the concerns expressed by the Chairman of the Commission in her dissent to the Commission's decision. Chairman Lane noted that the concept of "implied conflict is a dangerous precedent," and this Court shares those concerns. Our decision in this case should not be interpreted, in any way, as an expansion of the power of the federal government to preempt state laws in general. Our decision reaffirms the standard that conflict preemption is triggered only when it is "impossible to reconcile both state and federal laws or when the state law frustrates the purpose of federal law." *Lafferty,* 572 S.W.3d at 91. The requirement that, in order to be preempted by federal law, a state law must be one that "frustrates the purpose of federal law" or as we stated above, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[,]" *Boggs*, 520 U.S. at 844, is a significant burden to meet. This burden must be distinguished from a state law that merely differs from or adds additional requirements to a federal statute.

27

The court in *Lafferty* recognized, as this Court did in *Morgan*, that there is a natural friction between federal preemption and a state's inherent powers to police affairs that are traditionally and legally reserved to state control. However, as in the case before us, the *Lafferty* court recognized that federal laws that relate to federal programs, such as the VA, and which expend federal funding, are areas in which there has been a "history of significant federal presence." Specifically, the court in *Lafferty* found:

> Courts have long recognized an automatic presumption against preemption that federal acts ordinarily do not supersede historic police powers of the states. *Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). This automatic presumption against preemption, however, does not apply in this case due to the unique nature of the VA because "an assumption of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *U.S. v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). The circuit court correctly found:

>> [t]his case presents a unique circumstance where the VA is solely operated by the federal government. Traditionally health and safety of a state's citizens fall within the state's police powers; however, in this matter, the state is seeking to apply [Certificate of Need ("CON")] laws to a contractor of the VA. The federal government has historically governed benefits, including healthcare, of Veterans. The federal government's interest in caring for veterans is within the VA's purview and does not fall within the historical police powers of the state. The VA pays for the contracted services through the use of federal funds and the program provides health benefits conferred by the federal government. The state has never regulated the VA by virtue of its police powers, so far as this court is aware. Instead, the VA has traditionally been exempted from state CON laws. When VA facilities

28

> expand services, a VA facility does not have to
> comply with the CON requirements.

*Id.* at 90-91. Similarly, the case before us presents a unique circumstance in which a state law "frustrates" and "stands as an obstacle" to a federal purpose in relation to a veterans' program – an area that has traditionally been the subject of significant federal presence and control. Under these narrow and unique facts, the preemption exercised does not unreasonably supersede the police powers of our State. Our decision should be viewed under the prism of these unique facts and not be seen as embracing far-reaching preemption powers in the broader sense.

## IV. Conclusion

Accordingly, we conclude that the Commission was correct in its assessment that its jurisdiction to regulate CPC, an entity operating solely as a federal contractor and chosen by the VA to perform the contract pursuant to the requirements of Section 8127, was preempted by federal law.

Affirmed.